993 A.2d 874

**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Christian COLAVITA, Appellee.**

Supreme Court of Pennsylvania.

Submitted Feb. 6, 2009.

Decided April 29, 2010.

4

Arnold H. Gordon, Ronald Eisenberg, Hugh J. Burns, Jr., Peter Carr, Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania.

David Rudovsky, Kairys, Rudovsky, Messing & Feinberg, Philadelphia, for Christian Colavita.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Chief Justice CASTILLE.*

The Commonwealth appeals from the published opinion and order of the Superior Court, which reversed the order of the PCRA[1] court, vacated appellee's judgment of sentence for third-degree murder, and remanded the case for a new trial. The Superior Court held that appellee's trial counsel was ineffective in failing to object to the prosecutor's commentary concerning appellee having consulted with an attorney pre-arrest, finding in the process that the prosecutor's commentary violated the Due Process Clause of the Fourteenth Amendment and that the trial record, on its own, proved that counsel had no reasonable basis for failing to object. For the reasons that follow, we vacate the order of the Superior Court and remand to that court for proceedings consistent with this Opinion.

The facts adduced at trial demonstrated that in the early morning hours of Friday, December 10, 1999, Nicole Feehan was shot to death in her apartment on South Eighth Street in Philadelphia. At the time of her death, Ms. Feehan and appellee had been dating for a short period of time, according to her roommate, Dan Raz.

Mr. Raz testified that Ms. Feehan had been out late the night before the day in question, which was not unusual. He was in bed in his room, which was below Ms. Feehan's room,

---

* This case was reassigned to this author.

1. Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546.

when he heard Ms. Feehan return at about 6:00 or 7:00 a.m. and go upstairs to her bedroom. Mr. Raz testified that after some time passed, "I heard a very loud noise which sounding [sic] like something very heavy hitting the floor. After I heard that noise, I heard a male's voice saying ['Joh, shit, Nicole, Nicole, I'm sorry.['] In a kind of nervous laughter." Mr. Raz believed this to be appellee's voice and thought at first that something must have fallen over and broken upstairs in Ms. Feehan's room and that appellee was apologizing for having knocked it over. At around 8:00 a.m., Mr. Raz arose and went to his medical school classes. He did not return until about 8:00 p.m. that night, at which time he encountered Selina Osborne, Ms. Feehan's visiting friend from Australia, who was trying to find Ms. Feehan. When Mr. Raz entered the apartment and proceeded upstairs to Ms. Feehan's room, her door was open and he saw that she was prone on her bed. Mr. Raz "instantly knew something was wrong," felt her arm, which was "cold and stiff," and called 911. Ms. Feehan was later pronounced dead from a single gunshot wound to the mouth.

Ms. Osborne testified that she, Ms. Feehan, appellee, and several other friends including Rui DaSilva and Paula Fagulha went to several clubs in the Old City area of Philadelphia on the night before the shooting occurred. They had alcoholic drinks and used recreational drugs until the clubs closed, then went to Mr. DaSilva's apartment nearby to have more alcohol. Ms. Osborne decided to stay the night at Mr. DaSilva's after Ms. Feehan told her that she and appellee were going back to Ms. Feehan's apartment together and that Ms. Osborne would have to sleep on the couch if she came back with them. The next afternoon, when Ms. Osborne went to meet Ms. Feehan to go shopping, Ms. Feehan did not answer the door or her phone. Trying to track down Ms. Feehan, Ms. Osborne obtained appellee's cell phone number from Mr. DaSilva, but appellee did not answer her call. Ms. Osborne spent the rest of the day waiting for Ms. Feehan until Mr. Raz returned to the apartment that evening when they discovered Ms. Feehan's body.

Mr. DaSilva testified that he had been friends with appellee for two years at the time, during which they spoke almost every day and went out together almost every night. He noted that appellee carried a handgun with him every day. About two weeks prior to Ms. Feehan's death, Mr. DaSilva testified that the same individuals were together one night or early morning when appellee pulled out his concealed gun and showed it to them and that Ms. Feehan was "kind of startled." In Mr. DaSilva's opinion, it was an "uncomfortable situation" and no one was laughing. Mr. DaSilva corroborated that on the night of the shooting, he, appellee, Ms. Feehan, Ms. Osborne, and some others had consumed alcohol and used illegal drugs at some clubs, then went back to his apartment until the early hours of the morning. The next day, Mr. DaSilva tried to contact appellee numerous times on behalf of Ms. Osborne, but he never saw or heard from appellee again until the day of trial. He learned of Ms. Feehan's death later that night when he stopped at the bar where she had worked. Mr. DaSilva testified that he had been present once or twice when Ms. Feehan and appellee had argued with one another.

Paula Fagulha testified that she had known Ms. Feehan for several months; saw her almost every day; and that she was in the group that went out the night preceding the discovery of Ms. Feehan's body, but that she had left earlier in the evening when she learned that her daughter was sick. Ms. Fagulha had been present approximately two weeks earlier when appellee revealed his handgun at Mr. DaSilva's apartment, which Ms. Fagulha believed "surprised" Ms. Feehan. Ms. Fagulha related that Ms. Feehan and appellee seemed to argue quite often, which she learned from speaking with each of them independently.

The Philadelphia Police Department's crime scene investigator Avon Wilson processed the scene and testified that he observed no evidence of a struggle and that the manner of death was by an intraoral gunshot that exited through the back of Ms. Feehan's head. He did not believe that the gunshot wound was self-inflicted because of the way blood

presented on Ms. Feehan's right hand.[2] The Commonwealth's weapons expert concluded that the sole projectile recovered from the scene was consistent with the size of a bullet for a .45 caliber semi-automatic handgun. Edwin Lieberman, an assistant medical examiner who participated in Ms. Feehan's autopsy, testified that the blood on Ms. Feehan's right hand was inconsistent with her having held the gun in her own mouth.[3] Dr. Lieberman also testified that Ms. Feehan's toxicology results indicated the presence of alcohol, cocaine, and Ecstasy, a controlled substance, in her bodily systems at the time of death.

The defense's forensics expert on blood staining and spattering, Herbert L. MacDonell, disagreed with Dr. Lieberman's opinion that the blood on Ms. Feehan's right hand indicated that the fatal gunshot wound was not self-inflicted. Professor MacDonell opined that the only way Ms. Feehan could have gotten the blood on her right hand was for her to have been holding the gun when it fired, although he could not say whether the gunshot was self-inflicted, accidental or suicide. *Id.* at 195–96.

Appellee's mother, Marianne Colavita, also testified for the defense, stating that appellee called her at about 9:30 a.m. on Friday, December 10, 1999 and told her that he would be away for the weekend. She did not speak to appellee again before receiving a visit from her cousin, Roy Minieri, who stopped by the family's house in Lawrenceville, New Jersey, on either Saturday or Sunday and told her and appellee's father that some sort of problem had arisen with appellee and that they should get a lawyer for him. On Sunday afternoon, Mrs. Colavita met appellee at the office of two lawyers in northern

2. The trial court subsequently characterized the essence of Mr. Wilson's opinion as follows: "It was simply he said if the gun is in the mouth and blood comes out, the gun is going to block the hand, so how could blood get on the hand if the gun is in the hand." N.T., 2/26/03, at 8.

3. Dr. Lieberman testified that he was aware that Dr. Samantha Wetzler, with whom he conducted the autopsy, had testified before the grand jury that she could not rule out the possibility that Ms. Feehan may have had the gun in her hand or had her hand on the gun to try to push it away when the shot was fired. N.T., 2/26/03, at 34–38, 58–61.

New Jersey. Her understanding was that Mr. Minieri had set up the meeting. The next day, the Colavitas' home was searched by a Philadelphia homicide detective accompanied by a member of the New Jersey State Police. Subsequently, Mrs. Colavita spoke with appellee several times, during which he told her that the lawyers had instructed him not to discuss what had happened, but said that he was not involved.

Appellee testified at trial that he first met Ms. Feehan where she worked, at Club Deco in Philadelphia, that they began seeing each other romantically roughly three weeks prior to the shooting, and that they went out nearly every night drinking and using cocaine during that time. Appellee testified that he always carried his .45 caliber Smith and Wesson handgun for personal protection and that he would place it under the bed whenever he stayed over at Ms. Feehan's apartment. Appellee testified that he liked Ms. Feehan a lot, but that the relationship was not serious. He could not recall any major disagreements. Appellee admitted to previously showing Ms. Feehan the gun when they were in bed. Appellee also admitted that he would "kid around with her with the gun" when they were both intoxicated. Appellee also admitted that approximately two weeks before the shooting, he had taken his gun out of his waistband, grabbed Ms. Feehan, and told her to "freeze." Appellee recalled that Ms. Feehan was a bit surprised, but testified that she was not upset or angry because she knew that he was joking around.

Appellee further testified that on the night of the shooting, he and Ms. Feehan had been out with friends and then went back to her apartment in the early hours of the morning, where they used more cocaine and ingested Ecstasy. Appellee claimed that he put his gun under the bed and that they began getting intimate when Ms. Feehan reached over him, grabbed the gun, pointed it at him, and told him to take off his clothes.[4] Appellee testified that he took the gun from Ms.

4. Appellee subsequently testified on cross-examination that he and Ms. Feehan had engaged in "kinky sex" involving the gun, on her initiative, on one prior occasion, but that he had ensured the gun was unloaded and on safety at the time. N.T. 2/27/03, at 102–03.

Feehan, took the bullets out of the clip, put the clip back in the gun, and started to place the gun back under the bed when Ms. Feehan picked it up again. Next, according to appellee, Ms. Feehan told him, "[t]his is how I want to suck your cock," put the gun in her mouth, and the gun fired. Appellee recalled standing there in shock, maybe saying "[o]h, my God, oh, my God, Nicole, oh, my God," and that it was possible he said "Nicole, Nicole, I'm sorry," as Mr. Raz had recalled hearing. Appellee said he remembered nothing else but standing in disbelief and perhaps blacking out. He acknowledged that he left shortly thereafter, without calling the police or seeking help, because he was fearful and wondered how he would explain what had happened. He remembered taking the gun with him. Appellee testified that he felt horrible about Ms. Feehan's death and was responsible for what happened.

After the shooting, appellee claimed that he wanted to get as far away as possible and thus went to stay with his grandmother in New York. On the way there, he threw the gun over a bridge, from his car window. Appellee testified that he passed out at his grandmother's and that when he woke up, his head was clearer. Appellee said that he had wanted to explain what had happened, but didn't know who to call; he then decided to retain a lawyer. He was not arrested until almost two years later, in September 2001. Appellee denied that he placed the gun in Ms. Feehan's mouth and denied pulling the trigger.

On cross-examination, appellee stated that the first phone call he made from his grandmother's was to his cousin Roy Minieri to ask for help hiring a lawyer. Appellee also admitted that he never called anyone in Philadelphia to check on Ms. Feehan or to tell anyone what had happened. Appellee claimed that he never "racked" the gun so that a bullet would be in the firing chamber rather than only in the clip, but admitted that Ms. Feehan obviously could not have shot herself accidentally, as he contended, unless the gun had been racked and a bullet was in the chamber at the time. Appellee said he did not know how the bullet got into the chamber, that

he believed the gun's safety had been on, and that once he took the clip with the bullets out, the gun would be inoperable. Appellee recalled no major disagreements with Ms. Feehan, but said he believed she wanted to get more serious in the relationship, but that it was not his intention at that time. Appellee admitted taking the gun with him after the shooting and throwing it over a bridge, but denied that those actions had been calculated; he explained that it was more of a frightened reaction to the events. Appellee said he did not recall taking the shell casing with him or whether the gun was in Ms. Feehan's hand or had fallen from her hand when he took it. Appellee claimed that even though he had not fired the gun, he was too high, intoxicated, and panicked at the time to realize that if he called the police, they would have discovered that she had shot herself accidentally.

Jonathan Arden, M.D., a medical examiner, testified on behalf of the defense. Dr. Arden opined that it is "extraordinarily rare" that an intraoral gunshot would be homicidal (as opposed to self-inflicted) and even more unusual without signs of a struggle or altercation. Dr. Arden also opined that the extent of alcohol and drugs in Ms. Feehan's system at the time probably lessened her inhibitions and made her more likely to do something careless or dangerous. Based on observation of the autopsy materials, Dr. Arden believed that the gunshot that killed Ms. Feehan was self-inflicted. On cross-examination, Dr. Arden conceded that the evidence would not be inconsistent with the gun being used as part of a mutual sex play scenario.

A central issue at appellee's trial, given appellee's claim of accidental suicide, was appellee's conduct following the shooting. Pertinent to this appeal, the prosecutor's opening statement included the following:

> [T]he defendant's own mother will say [that] right after the murder, she gets a phone call from a relative. Based on the conversation she has with this relative in New York, she sees her son in a lawyer's office on Sunday morning in New Jersey.... [The victim] is murdered Friday morning. 48 hours later [appellee is] in a lawyer's office. [His mother]

doesn't discuss the case with him. She's not allowed to. But he's got a lawyer already. No phone calls are ever made to [appellee's] cell phone letting him know what happened, but he's got a lawyer somehow.

N.T., 2/25/03, at 45–46. The defense lodged no objection to this argument. Indeed, appellee's trial counsel's own opening statement, which immediately followed, also addressed appellee's conduct after the shooting:

[Appellee] didn't go run and hide somewhere. He didn't know what to do, the evidence will show. He talked to his mom and he talked to some other relatives in the family, and guess what? Within 48 hours later he's in a lawyer's office. He's in a lawyer's office. And right after that, the lawyer contacted the District Attorney's office and says ["]I represent this young man. He's not going anywhere. If some kind of charges come out of this, he'll turn himself in and deal with it.["] ... So, yeah, he went to a lawyer. I mean if it was your son and your son came to you ... what are you going to tell him to do? ["]My God, you've got to go see a lawyer.["] He went and saw a lawyer within 48 hours. And the lawyer said, ["]if they bring charges, he's not going anywhere. He'll turn himself in.["]

*Id.* at 62–63.

Defense counsel's closing argument reiterated this point: "This wasn't a man that had a hardness of heart. This was a man that ... within 48 hours was in a lawyer's office saying, ['] hey, I have a problem here. What should I do?[']" The prosecutor responded to this argument as follows:

And then he goes to New York and he passes out. And when he finally came to and came to his senses, what's the first thing he did? ... Does he think to pick up the phone maybe in New York and call down here, anybody, Rui DaSilva, Selina, somebody. ["]Oh, my God, there's been a terrible accident.... I don't know what to do. I freaked out.["] He called a family member to get himself a lawyer. Does that sound like a man ... who just witnessed an

accident? Or do you think that's a man that's got a little guilty knowledge? You think that's a man that's culpable?

\* \* \*

Is that consistent of an innocent man? If he takes the gun, he takes the shell casing, he sets up his own lawyer before the body is even found, sets up his own lawyer and then lied to mom about even knowing [the victim].

N.T., 2/28/03, at 71–72, 74.

On March 3, 2003, the jury convicted appellee of third-degree murder, while acquitting him of possessing an instrument of crime. Appellee was sentenced to seven and one-half to fifteen years of imprisonment on June 18, 2003. On direct appeal, the Superior Court affirmed the judgment of sentence in an unpublished opinion; this Court declined further review. *Commonwealth v. Colavita,* 860 A.2d 1125 (Pa.Super.2004), *appeal denied,* 582 Pa. 693, 871 A.2d 188 (2005).

Represented by new counsel, appellee filed a timely petition for relief under the PCRA alleging ineffectiveness of trial counsel "for failing to object to the several references during the prosecutor's opening and closing arguments and cross-examination where the prosecutor argued that [appellee] hired counsel prior to his arrest and that the jury should infer a negative inference from it." Petition, 4/4/05, at 2. In an accompanying memorandum, appellee stated that "[t]he prosecution emphasized the fact that [appellee] immediately retained counsel, as was his federal and state constitutional right, immediately after the death of the decedent, and 22 months prior to his arrest." Appellee argued that the prosecutor dwelled upon this information and "urged an adverse inference from it in his closing argument." Appellee relied primarily upon *United States ex. rel. Macon v. Yeager,* 476 F.2d 613 (3d Cir.1973), which in turn relied upon *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), for the proposition that comments such as those at issue here are "an unconstitutional comment of [sic] a defendant's right to counsel." Memorandum, 4/4/05, at 1–2.

On December 16, 2005, Judge John Poserina, sitting as the PCRA court, denied without a hearing appellee's petition as meritless. The PCRA court later issued an opinion stating that appellee did not establish ineffectiveness of counsel "because the evidence complained of was used as part of [appellee's] own trial strategy," including the decision to have appellee testify about having met with counsel as part of his actions after the shooting occurred. PCRA Ct. Op., 5/25/06, at 6. The PCRA court noted that counsel had used the evidence of appellee's post-shooting conduct "in an attempt to undercut the consciousness of guilt theory advanced by the Commonwealth" by showing that appellee panicked, but did not act with "hardness of heart," and was willing to turn himself in if necessary. The PCRA court concluded: "Given the circumstances, this Court believes this was a reasonable trial strategy designed to advance [appellee's] best interests, and [appellee] cannot show that he was prejudiced by counsel's actions." *Id.*

Appellee appealed to the Superior Court, renewing his single ineffectiveness claim. Appellee argued that the prosecutor improperly commented upon "the fact that [appellee] immediately retained counsel, even though it was his federal and state constitutional right, immediately after the death of the decedent, and 22 months prior to his arrest." Relying again on *Macon*, appellee asserted that "[t]his line of prosecutorial attack was in strict violation of [appellee's] rights under both federal and state constitutions." Appellee cited three Pennsylvania cases where prosecution comments or questions were found constitutionally improper: *Commonwealth v. Drass*, 718 A.2d 816 (Pa.Super.1998), *Commonwealth v. Haideman*, 449 Pa. 367, 296 A.2d 765 (1972), and *Commonwealth v. Welch*, 401 Pa.Super. 393, 585 A.2d 517 (1991).[5]

5. In *Drass*, the Superior Court found ineffective assistance of counsel for failing to object to improper implication by the prosecutor of the defendant's Fifth Amendment right to silence. In *Haideman*, a direct appeal, this Court held that admission of evidence of the defendant's request for counsel and his silence at the time of arrest amounted to a Fifth Amendment violation and reversible error. In *Welch*, the Superior Court held it was reversible error to allow testimony regarding the defendant's refusal to consent to a search in the absence of a warrant,

Appellee added that trial counsel could have had no rational basis not to object to the prosecution's references and that the impact of the prosecution's unchallenged statements prejudiced him because his credibility was essential to his defense of accidental suicide. Superior Court Brief, at 13–16.

The Commonwealth responded by arguing, *inter alia*, that appellee's claim was both waived and meritless. The waiver, according to the Commonwealth, derived from appellee's failure to present an offer of proof supporting his allegation that, if an evidentiary hearing were held, trial counsel would testify that he had no reasonable basis not to object to the prosecutor's comments.[6]

On the merits, the Commonwealth argued that appellee's ineffectiveness claim failed because no constitutional right exists to consult with counsel prior to arrest or prior to an adverse judicial proceeding; "a prosecutor's comments cannot constitute an undue burden on a *non-existent* constitutional right." The Commonwealth noted that *Macon* was both non-precedential and discredited, at least by implication, in this Court's opinion in *Commonwealth v. Clark*, 551 Pa. 258, 710 A.2d 31 (1998), *abrogated on other grounds by Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003).[7] The Common-

which implicated the defendant's Fourth Amendment rights. None of the cases involved commentary on pre-arrest consultation with an attorney.

6. The Commonwealth argued that appellee's argument was independently waived because he failed to comply with the PCRA court's Pa.R.A.P. 1925(b) order. Appellee responded that he was never served with an order requesting a 1925(b) statement. The panel declined to find waiver because the certified record contained neither a 1925(b) order nor an indication that notice of such an order was sent to appellee. The propriety of that resolution is not before this Court. The Commonwealth also argued that appellee's claim was previously litigated on direct appeal as a claim of prosecutorial misconduct, which the Superior Court had rejected by holding that the prosecutor's comments were a fair comment upon, or fair response to, the defense theory. The panel rejected this claim and the propriety of that resolution is likewise not encompassed within this Court's grant of review here.

7. In *Clark*, this Court did not address *Macon*, but rejected as overly broad an application by the Third Circuit in another case of the rule in

wealth echoed the PCRA court's conclusion that counsel's attempt to reframe and reinterpret the evidence of appellee's post-shooting, but pre-arrest contact with counsel was a reasonable strategy and that appellee could not show prejudice because the comments were "a very small part of the lengthy trial and summation; were not couched in inflammatory rhetoric; and were part of the natural back and forth between opposing attorneys." Commonwealth's Superior Court Brief, at 14–15.

In his reply brief in the Superior Court, appellee for the first time cited the Ninth Circuit's *per curiam* decision in *Bruno v. Rushen*, 721 F.2d 1193 (9th Cir.1983) for the proposition that the prosecution may not implicate "the defendant's right to counsel," even if the defense raises the issue first. Superior Court Reply Brief, at 8.[8]

The Superior Court reversed and remanded for a new trial in a published opinion. *Commonwealth v. Colavita*, 920 A.2d 836 (Pa.Super.2007). The panel discussed *Macon* in great detail and drew from it the broad principle that "a prosecutor cannot argue that a defendant's constitutionally-protected conduct supports an inference of his guilt." *Id.* at 841–42. The panel noted, however, that "unlike the Third Circuit [in *Macon*], we do not base our holding on the Sixth Amendment. Indeed, the 'right to counsel' does not attach until the initiation of adverse judicial proceedings, which had not occurred at the time when [appellee] first retained counsel in this case." *Id.* at 842–43. The panel then quoted the Ninth Circuit decision in *Bruno* at length, stating that that decision was the "appropriate basis" for its determination that the prosecutor's conduct at appellee's trial "was so fundamentally unfair as to

*Griffin*, prohibiting use by the prosecution of language "intended to create for the jury an adverse inference from the failure of the defendant to testify." 710 A.2d at 39.

8. *Bruno* involved a state murder conviction where the federal district court granted *habeas corpus* relief. In a *per curiam* opinion affirming the grant of the writ, the Ninth Circuit noted that the prosecutor had made "egregious" and "insidious" comments implying, *inter alia*, that the mere fact that the defendant (or any defendant) hired counsel suggested guilt. The Ninth Circuit held that there was constitutional error in the prosecutor's arguments.

18

violate the Due Process Clause of the Fourteenth Amendment" which, the panel stated, "protects a defendant's choice and ability to retain counsel before arrest." *Id.* at 843–44. The panel opined that:

> [I]t would be patently absurd to permit argument at trial allowing a negative inference of consciousness of guilt to be drawn when one under suspicion of committing a crime but, nevertheless, clothed with the presumption of innocence, hires an attorney prior to being arrested, presumably to ward off an offense being charged, or to defend him at trial for an impending charge and, yet, in the same vein, to forbid such argument if the defendant has already been arrested.

*Id.* at 844. Thus, in the panel's view, at the time this case was tried, the federal constitution prohibited any reference to pre-arrest or post-arrest consultation with counsel, albeit the panel viewed the twin constitutional prohibitions as deriving from different constitutional provisions and theories. The panel dismissed the Commonwealth's arguments that the prosecutor's comments were a fair response to the evidence of record and to the defense theory and concluded that appellee's ineffectiveness claim had arguable merit.

Turning to whether counsel's failure to object had a reasonable basis, the panel rejected the Commonwealth's waiver argument and concluded that appellee had set forth a sufficient proffer in his PCRA petition, even though he did not allege how trial counsel would respond to the assertion that counsel was ineffective, because "[t]he sole relevant evidence at the hearing would have been trial counsel's testimony on this issue." The panel then summarily found that the trial record alone decisively proved that counsel lacked a reasonable basis for failing to object: "we conclude that this is one rare instance where the record, viewed alone, demonstrates that trial counsel's actions had no reasonable basis." The panel supported its *per se* finding by noting that, in cases involving failure to object to an impermissible reference to a defendant's post-arrest silence, Pennsylvania courts had found counsel's actions unreasonable "on the face of the record, without discussion of possible strategies by trial counsel"

because "the defendant was penalized for exercising a consti-
tutional right guaranteed to the states [sic] by the Due
Process Clause." *Id.* at 845 (citing *Commonwealth v. Costa*,
560 Pa. 95, 742 A.2d 1076 (1999)). The panel saw "little
distinction" between the post-arrest silence cases and the facts
in this case because the jury was left "with the belief that it
could infer [appellee's] guilty conscience by virtue of his
consultation with counsel, *i.e.*, a fundamentally unfair argu-
ment violating the Due Process Clause." *Id.*[9]

Before turning to its evaluation of prejudice, the panel
included a footnote in an effort to align its due process holding
with cases on the Sixth Amendment right to counsel:

At this point, we must emphasize that we are not expanding
a defendant's pre-arrest rights, and we are not expanding
the time when the right to counsel attaches. In this case,
we are presented with a situation wherein a person, con-
cerned with the state of his legal affairs, sought out counsel
prior to a possible impending arrest and, at trial, was
penalized for this activity through the Commonwealth's
argument. Such activity by the Commonwealth ... frus-

9. The right to silence at issue in the post-arrest silence cases derives
from the Fifth Amendment privilege against self-incrimination, as rec-
ognized in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d
694 (1966). *Miranda* and its progeny also recognize a related right to
counsel deriving from the Fifth Amendment:

In addition to the Sixth Amendment right to counsel, the United
States Supreme Court has held that a separate right to counsel is
encompassed in the Fifth Amendment guarantee that "[n]o person
... shall be compelled in any criminal case to be a witness against
himself." *See McNeil v. Wisconsin*, 501 U.S. 171, 177–78, 111 S.Ct.
2204, 2209, 115 L.Ed.2d 158 (1991). The United States Supreme
Court described the Fifth Amendment right to counsel as one of
several "prophylactic rights designed to counteract the 'inherently
compelling pressures' of custodial interrogation." *Id.* at 176–77, 111
S.Ct. at 2208 (citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602,
16 L.Ed.2d 694 (1966)).

*Commonwealth v. King*, 554 Pa. 331, 721 A.2d 763, 774 n. 4 (1998); *see
also Florida v. Powell*, —— U.S. ——, ——, 130 S.Ct. 1195, 1203, 175
L.Ed.2d 1009 (2010) (noting that *Miranda* gave force to the Fifth
Amendment protection against compelled self-incrimination by, *inter
alia*, requiring as an "absolute prerequisite to interrogation" that an
individual held for questioning "must be clearly informed that he has
the right to consult with a lawyer and to have the lawyer with him
during interrogation." [*Miranda*, 384 U.S. at 471, 86 S.Ct. 1602.]).

trates the efficient administration of justice. *Bruno,* 721 F.2d at 1194. Therefore, our conclusions with regard to the Due Process violations that took place in this case do not expand a defendant's pre-arrest rights, they merely enforce a person's ability to seek and hire counsel prior to arrest without fear that the pre-arrest retention of counsel will be utilized as evidence demonstrating his guilt.

920 A.2d at 845 n. 5.

Finally, with respect to prejudice, the panel noted that this case entailed significant circumstantial evidence and contrasting testimony, that appellee's credibility as the sole eyewitness was at issue, and that the presentation of his actions and conduct after the shooting was crucial to the jury's assessment. In light of the foregoing, the panel concluded that an objection by counsel to the prosecutor's comments would have prevented the subject from "infecting" the trial and the jury would likely have reached a different verdict. *Id.* at 845–46.

■■■ The Commonwealth filed a Petition for Allowance of Appeal with this Court, which was granted on June 11, 2008. The following three issues were accepted for review:

1. Does the Superior Court's published decision contravene the precedent of this Court in that it grants relief based on a legal theory—that the due process clause of the Fourteenth Amendment guarantees a constitutional right to consult with counsel prior to the initiation of adverse proceedings—that defendant did not raise in the PCRA court or on appeal?

2. Did the Superior Court further contravene the precedent of this Court when, without learning what trial counsel's actual strategy or thought process was, it deemed his performance unreasonable because he failed to anticipate the Superior Court's novel development in the law?

3. In [any] event, is the Superior Court's holding—that the due process clause of the Fourteenth Amendment guarantees a constitutional right to consult with counsel prior to the initiation of adverse proceedings—wrong on the merits

since the due process clause may not be used to expand the scope of the constitutional right to counsel?

■■ These issues pose purely legal questions; thus, this Court's review of the Superior Court's determinations is plenary and *de novo*. *Commonwealth v. Mallory*, 596 Pa. 172, 941 A.2d 686, 694 (2008). To the extent review of the PCRA court's determinations is implicated, an appellate court reviews the PCRA court's findings of fact to determine whether they are supported by the record, and reviews its conclusions of law to determine whether they are free from legal error. The scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the trial level. *Commonwealth v. Sam*, 597 Pa. 523, 952 A.2d 565, 573 (2008).

■■ The single issue raised in the PCRA proceeding involved ineffective assistance of counsel. Counsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687–91, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In Pennsylvania, we have refined the *Strickland* performance and prejudice test into a three-part inquiry. To prove counsel ineffective, the petitioner must show that: "(1) the underlying legal issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice befell petitioner from counsel's act or omission." *Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220, 233 (2006) (citing *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 975 (1987) (adopting U.S. Supreme Court's holding in *Strickland* )). "Generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests." *Commonwealth v. Howard*, 553 Pa. 266, 719 A.2d 233, 237 (1998). "A finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Id.*

To demonstrate prejudice, the petitioner must show that there is "a reasonable probability that, but for counsel's error or omission, the result of the proceeding would have been different." *Commonwealth v. Sneed*, 587 Pa. 318, 899 A.2d 1067, 1084 (2006), *abrogated on other grounds by Commonwealth v. Jones*, 597 Pa. 286, 951 A.2d 294 (2008) (citing *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052).

The Commonwealth's first and third arguments are interrelated. Thus, we will address those arguments before turning to the Commonwealth's claim concerning the Superior Court panel's finding that counsel's failure to object was *per se* unreasonable.

The Commonwealth first claims that the Superior Court panel erred in granting relief to appellee premised on a theory that the prosecutor's comments on appellee's pre-arrest consultation with a lawyer violated appellee's Fourteenth Amendment substantive due process rights such that counsel was obliged to raise that particular objection. The Commonwealth argues that this theory of objection was not the underlying basis for appellee's claim of ineffectiveness at the PCRA level or in his Superior Court brief, and thus the panel below erred in raising and then crediting the theory *sua sponte,* finding counsel ineffective *per se,* and overturning the judgment of the PCRA court on a theory never posed to that court. The Commonwealth notes that, although appellee's PCRA petition assailed counsel for failing to object to the prosecutor's comments, neither the petition nor any of the cases appellee cited to the PCRA court articulated the theory that Fourteenth Amendment substantive due process prohibits prosecution commentary on pre-arrest consultation with counsel, just as the Sixth Amendment separately prohibits negative commentary on post-arrest consultation.

The Commonwealth adds that, in the Superior Court, appellee likewise did not fault counsel for failing to raise a Fourteenth Amendment substantive due process objection. The Commonwealth acknowledges that appellee referenced the Ninth Circuit's decision in *Bruno* in his Superior Court reply

brief, but notes that a reply brief is not the proper vehicle for raising a new claim. *See, e.g., Commonwealth v. O'Berg,* 584 Pa. 11, 880 A.2d 597, 599 n. 2 (2005). Moreover, the Commonwealth notes, *Bruno* was "doctrinally ambiguous" in that, while it adverted to due process, the due process violation appeared to consist of improper commentary on the Sixth Amendment right to counsel. The Commonwealth adds that the Ninth Circuit itself has since repeatedly confirmed the Sixth Amendment basis for the decision. *See, e.g., United States v. Santiago,* 46 F.3d 885, 892 (9th Cir.1995). Thus, appellee's citation of *Bruno* cannot convert his Sixth Amendment theory into a substantive due process theory. In any event, the Commonwealth asserts that appellee's actual theory of objection to the prosecutor's comments all along sounded in its alleged burdening of his Sixth Amendment right to counsel and not in its violation of substantive due process. Thus, the Commonwealth concludes that the underlying theory upon which the panel found trial counsel's performance deficient was neither available to, nor actually before, the panel, and that basis for relief should not have been introduced by the panel *sua sponte* and then employed to upset the judgment of the PCRA court, which had confined itself to the theory appellee actually pursued.

Appellee responds that the Commonwealth confuses the underlying claim in his PCRA petition with the arguments he forwarded to support the claim. Appellee notes that his petition alleged that he was denied a fair trial through counsel's failure to object to the prosecutor's comments, which is an argument sounding in due process of law. Appellee adds that, in his supporting memorandum before the PCRA court, he had asserted that the prosecutor's comments violated his rights under both the federal and state constitutions. Appellee adds that the cases he cited were based on, but not limited to, a mix of Fifth, Sixth, and Fourteenth Amendment theories, all of which he says supported his argument. Appellee cites *Commonwealth v. Collins,* 598 Pa. 397, 957 A.2d 237 (2008), for the proposition that as long as a PCRA petitioner asserts facts that support a claim, specific theories, grounds, or argu-

ments need not be further articulated. Finally, appellee refutes the Commonwealth's assertion that his claim is based solely upon the Sixth Amendment right to counsel, asserting that his generic claim of being denied a "fair trial" invoked due process principles.

In reply, the Commonwealth reiterates that appellee did not purport to raise a Fourteenth Amendment due process theory of objection in either his PCRA petition or his brief to the Superior Court. The Commonwealth notes that, while some of the cases appellee cited reference due process generally, none support a novel claim of a due process right to consult with counsel at the pre-arrest stage that cannot be burdened by relevant, negative commentary. The Commonwealth distinguishes *Collins* because the defendant there both pleaded and developed the precise legal ground upon which the claim was based, which is not the case here. The Commonwealth concludes that the Superior Court's *sua sponte* resolution of this appeal premised upon a foregone due process objection "unfairly rewarded [appellee] and punished the Commonwealth for [appellee's] omission." Commonwealth's Reply Brief, at 8.

In its third claim, the Commonwealth separately takes issue with the merits of the Superior Court panel's analysis of the substantive due process objection that the panel faulted trial counsel for failing to pursue. The Commonwealth contends that the panel erred in employing a Fourteenth Amendment due process theory to effectively extend the Sixth Amendment right to counsel to pre-arrest legal consultations. Citing settled law from the U.S. Supreme Court and this Court, *see, e.g., United States v. Gouveia,* 467 U.S. 180, 187, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984); *Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831, 844 (2003), the Commonwealth notes that in criminal cases the Sixth Amendment right to counsel attaches only at or after the initiation of adversarial judicial proceedings against an accused, and not before. Indeed, the Commonwealth adds, if an individual "had a constitutional right to counsel at every moment of his life, or at least every moment following a potentially criminal incident, there would

be no purpose to the Sixth Amendment's more limited grant of such a right to individuals faced with 'criminal prosecutions.' " Commonwealth's Brief, at 26–27. The Commonwealth urges that, under the teachings of the U.S. Supreme Court, the Due Process Clause may not be used to bypass the express limitations of an enumerated constitutional right.

In response, appellee notes that the Superior Court panel expressly declared that its decision did not expand the Sixth Amendment right to counsel. Appellee also contends that the Commonwealth's argument that the right to counsel is limited to "criminal prosecutions" fails to account for the U.S. Supreme Court's recognition of a due process right to counsel of choice in civil as well as other judicial and administrative proceedings.

The Commonwealth replies that appellee confuses procedural due process, which includes the right to counsel of one's choice in judicial or administrative proceedings, with the more nebulous concept of substantive due process, as well as with the circumstances here where there was no "proceeding" at the time appellee consulted with counsel shortly after the fatal shooting. The Commonwealth notes that no court has yet held that the guarantees of counsel in the procedural due process context, much less in the substantive due process context, may be the basis for expansion of the right to counsel in criminal cases beyond the set boundaries of the enumerated amendment specifically addressing the right to counsel. In effect, the Commonwealth argues, the Superior Court and appellee "have concocted out of whole cloth a substantive due process right to counsel that has all of the benefits of the same Sixth Amendment right but none of the limitations." Commonwealth's Reply Brief, at 17. The Commonwealth indicates that this sort of expansion has been recognized only in two cases, neither of which is binding authority in Pennsylvania: *State v. Dixon*, 279 Kan. 563, 112 P.3d 883 (2005) and *Hunter v. State*, 82 Md.App. 679, 573 A.2d 85 (1990), *superseded on other grounds by rule as stated in Drake & Charles v. State*, 186 Md.App. 570, 975 A.2d 204 (2009). By contrast, the Commonwealth asserts, the U.S. Supreme Court has been

firm and clear that where an enumerated amendment provides "an explicit textual source of constitutional protection . . . that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing claims that fall within the ambit of other amendments." Commonwealth's Reply Brief, at 21 (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).

To properly understand these twin arguments, and the propriety of the Superior Court decision below, an appreciation of the interplay of the Sixth Amendment right to counsel and the scope of Fourteenth Amendment due process is essential. In the early part of the twentieth century, due process claims in the criminal arena relied upon the concept familiarly known as "substantive due process." In *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), a right to counsel case, the U.S. Supreme Court stated:

> The fact that the right involved is of such a character that it cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions is obviously one of those compelling considerations which must prevail in determining whether it is embraced within the due process clause of the Fourteenth Amendment, although it be specifically dealt with in another part of the Federal Constitution. . . . It is possible that some of the personal rights safeguarded by the first eight Amendments against national action may also be safeguarded against state action, because a denial of them would be a denial of due process of law. If this is so, it is not because those rights are enumerated in the first eight Amendments, but because they are of such a nature that they are included in the conception of due process of law. . . . [A] consideration of the nature of the right and a review of the expressions of this and other courts makes it clear that the right to the aid of counsel is of this fundamental character.

*Id.* at 67–68, 53 S.Ct. 55 (citations and internal quotation marks omitted). In the mid-twentieth century, however, the U.S. Supreme Court, acting through the Fourteenth Amend-

ment's Due Process Clause, made some (but not all) of the specific provisions respecting the national power found in the first eight Amendments applicable to the individual states; the process is recognized as the incorporation doctrine. Here is the Court, over sixty years after *Powell,* speaking post-incorporation:

> Because we have always been reluctant to expand the concept of substantive due process, ... we held in *Graham v. Connor,* 490 U.S. 386, [395,] 109 S.Ct. 1865, [1871,] 104 L.Ed.2d 443 (1989) that, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."

*County of Sacramento v. Lewis,* 523 U.S. 833, 842, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (further citations and internal quotation marks omitted); *see also United States v. Lanier,* 520 U.S. 259, 272 n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) ("[I]f a constitutional claim is covered by a specific constitutional provision, ... the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.").[10] In the post-incorporation era, when asked to embrace an innovative federal constitutional rule, courts must recognize and work within the parameters of the relationship between the enumerated amendments and Fourteenth Amendment due process while attempting to predict what the High Court might do faced with the same proposal or question.

The Sixth Amendment speaks of a right to the assistance of counsel in "criminal prosecutions" and that right to counsel is one of the specific incorporated rights. *See Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). But the right as incorporated is not without

10. *Accord Dist. Attorney's Office for Third Jud. Dist. v. Osborne,* —— U.S. ——, ——, 129 S.Ct. 2308, 2322, 174 L.Ed.2d 38 (2009) (rejecting claim of substantive due process right to DNA testing with new technology; "There is no long history of such a right, and the mere novelty of such a claim is reason enough to doubt that substantive due process sustains it.") (internal quotation marks omitted).

temporal limits. The right to counsel attaches at a particular point in time which reflects its "criminal prosecution" roots: "[A] criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel." *Commonwealth v. McCoy*, 601 Pa. 540, 975 A.2d 586, 590 (2009) (quoting *Rothgery v. Gillespie County, Tex.*, 554 U.S. 191, 191, 128 S.Ct. 2578, 2592, 171 L.Ed.2d 366 (2008)).

Given these fundamental precepts, it is not enough to simply declare, as the panel below did, that the substantive due process right to pre-arrest consultation with counsel that it recognized in finding counsel ineffective did "not expand[ ] a defendant's pre-arrest rights, and [did not] expand[ ] the time when the right to counsel attaches." 920 A.2d at 845 n. 5. Even if we were to assume that the panel's stand-alone due process analysis was persuasive (a point we do not pass upon), the panel itself recognized that the Sixth Amendment right to counsel in criminal cases does not attach until adversary proceedings begin. Moreover, no existing authority from the U.S. Supreme Court, this Court, or the Superior Court has recognized a right to counsel pre-arrest. Thus, the panel's holding obviously was in tension with the enumerated right to counsel. At a minimum, the panel should have been more attuned to this tension and complexity, particularly since the due process right it recognized and enforced was forwarded in the context of a collateral attack premised upon counsel ineffectiveness.

⬛⬛⬛ With this context in mind, we turn now to the Commonwealth's specific arguments. It is a settled principle of appellate review, of course, that courts should not reach claims that were not raised below. *See* Pa. R.A.P. 302(a). The principle applies to PCRA appeals no less than to other appeals. *See Commonwealth v. Ligons*, 601 Pa. 103, 971 A.2d 1125, 1162–63 (2009) (Castille, C.J., concurring) (collecting cases). A corollary of this salutary restriction is that courts generally should not act *sua sponte* to raise claims or theories

that the parties either did not raise below or failed to raise in their appellate pleadings. "This Court has consistently held that an appellate court cannot reverse a trial court judgment on a basis that was not properly raised and preserved by the parties." *Steiner v. Markel*, 600 Pa. 515, 968 A.2d 1253, 1256 (2009) (citing *Danville Area Sch. Dist. v. Danville Area Educ. Ass'n*, 562 Pa. 238, 754 A.2d 1255, 1259 (2000); *Commonwealth v. Boros*, 533 Pa. 214, 620 A.2d 1139, 1140 (1993); and *Fisher v. Brick*, 358 Pa. 260, 56 A.2d 213, 215 (1948)). "Where the parties fail to preserve an issue for appeal, the Superior Court may not address that issue *sua sponte*." *Id.* at 1257 (citing *Knarr v. Erie Ins. Exch.*, 555 Pa. 211, 723 A.2d 664, 666 (1999); *Wiegand v. Wiegand*, 461 Pa. 482, 337 A.2d 256, 257–58 (1975)). The rule is no different in the constitutional context. *Wiegand*, 337 A.2d at 257 ("Because the constitutionality of these provisions was never questioned by the parties either in the trial court or in their briefs in the Superior Court, we conclude that this issue was not properly before the court.").[11]

Upon careful review, we conclude that the Commonwealth is correct that the panel based its finding of counsel ineffectiveness upon a distinct constitutional theory which was neither specified by appellee nor fairly suggested by the theory appellee actually pursued in the PCRA court and on appeal to the

11. The point of concern here, where it is alleged that a waived (or never made) argument is invoked to reverse the judgment below, is distinct from the circumstance where an appellate court addresses a record-based alternative argument which supports the judgment below. *See generally*, Thomas G. Saylor, *Right for Any Reason: An Unsettled Doctrine at the Supreme Court Level and an Anecdotal Experience with Former Chief Justice Cappy*, 47 Duq.L.Rev. 489, 490, 494 (2009) (discussing countervailing arguments regarding Pennsylvania Supreme Court's authority to "sustain a valid judgment or order of a trial or lower appellate court for any valid reason appearing as of record," in order "to effectuate substantial justice"). *See also Commonwealth v. Edwards*, 588 Pa. 151, 903 A.2d 1139, 1157–59 (2006) (on direct appeal, affirming trial court's admission of evidence on alternative grounds not "proffered by the Commonwealth or the trial court"); *Commonwealth v. Sholcosky*, 553 Pa. 466, 719 A.2d 1039, 1047 (1998) (Saylor, J., dissenting) (dissenting from plurality decision in part because "an appellate court may sustain a correct judgment based upon any valid reason that is supported by the record").

Superior Court. Appellee's memorandum in support of his PCRA petition alleged that trial counsel was ineffective in failing to object to the prosecutor's questioning and statements concerning appellee's pre-arrest consultation with counsel on grounds that they burdened the right to counsel:

The prosecution emphasized the fact that [appellee] immediately retained counsel, **as was his federal and state constitutional right,** immediately after the death of the decedent, and 22 months prior to his arrest.... In *U.S. ex rel. Macon v. Yeager,* 476 F.2d 613 (3d Cir.1973), the Third Circuit granted *habeas corpus* relief to a New Jersey state prisoner in a case strictly similar to the present case.... Relying upon *Griffin v. California,* 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106] (1965), the Third Circuit, as a matter of federal constitutional law, held that this evidence and his argument, constituted an **unconstitutional comment of [sic] a defendant's right to counsel. Similarly,** [i]n this case, the prosecutor even more dramatically elicited this evidence and repeatedly made this argument, and as in *Macon,* he did so without objection. *[S]ee also, Commonwealth v. Haideman,* [449 Pa. 367] 296 A.2d 765 (Pa.1972); *Commonwealth v. Welch,* [401 Pa.Super. 393] 585 A.2d 517 (Pa.Super.1991).... There was no lawful basis for [the] line of questioning or statements made by the prosecutor.

Memorandum, 4/4/05, at 1–2 (emphases added).

The only "right" appellee specifically identified in the foregoing is the right to counsel and, correspondingly, his argument never mentions the Fourteenth Amendment, fundamental fairness, or generalized notions of substantive due process. Nor does appellee's argument acknowledge the contours of the enumerated right to counsel, much less does it purport to inform the court that the right he intended to reference was different from and was more expansive than the Sixth Amendment right to counsel. Appellee never placed the PCRA court or the Commonwealth on notice that, in faulting counsel, he was seeking to vindicate, or establish, a broader pre-arrest due process constitutional right to counsel. Furthermore, none of the cases appellee cited involved substantive due

process under the Fourteenth Amendment. *Macon,* appellee's primary authority, was a Sixth Amendment case in which the Fourteenth Amendment appears only as the vehicle of incorporation. *See Macon,* 476 F.2d at 615 ("Macon [asserted] that the prosecutor's statement about his call to a lawyer violated his Sixth Amendment right to counsel, as applied to the states through the Fourteenth Amendment.... [I]n the present case, the relevant constitutional provision called into question is the Sixth Amendment right to counsel."). *Griffin* involved the Fifth Amendment privilege against self-incrimination; *Haideman* involved the Fifth Amendment right to post-arrest silence; and *Welch* involved the Fourth Amendment protection against unreasonable searches. In short, nothing in appellee's petition or supporting memorandum indicated to the Commonwealth or the PCRA court that appellee was alleging that trial counsel's performance was deficient because he failed to argue for a free-ranging Fourteenth Amendment due process right to consult counsel pre-arrest, a right immune from negative commentary at trial.

Likewise, on appeal to the Superior Court, appellee led his brief with *Macon* and relied again upon *Griffin, Haideman, Welch,* and also *Drass,* a case involving the Fifth Amendment right to post-arrest silence. Each of these cases involves rights expressed and secured by enumerated amendments, which, as our discussion above makes clear, is simply not the same as a claim based upon Fourteenth Amendment substantive due process considerations. Appellee's citation to *Bruno* in his reply brief to the Superior Court does not change matters, for several reasons. First, and contrary to the Superior Court's construction, *Bruno* does not purport to recognize a due process right to counsel pre-arrest (and indeed, the Ninth Circuit construes the case as premised upon the Sixth Amendment right). *See, e.g., Santiago,* 46 F.3d at 892. Second, appellee invoked *Bruno* with regard to the Sixth Amendment right to counsel and not substantive due process. *See* Appellee's Reply Brief to the Superior Court, at 8. Third, a reply brief is not an appropriate vehicle to raise a new claim. *See, e.g., O'Berg,* 880 A.2d at 599 n. 2. Finally, it is notable that

appellee never argued to the Superior Court that either the PCRA court or the Commonwealth had misapprehended his argument as implicating the Sixth Amendment right to counsel, rather than Fourteenth Amendment substantive due process.

The fact that appellee alleged simply that he was denied a fair trial by trial counsel's alleged ineffectiveness did not operate to articulate and preserve an implied theory of objection premised upon substantive due process. We read that allegation of harm as referring to appellee's cognizable claim of ineffectiveness, which requires a showing of prejudice. Moreover, we decline to hold that such a generic allegation invites or obliges the Commonwealth and the PCRA court to identify distinct theories of objection not actually identified by appellee with any specificity or coherence. We conclude that appellee simply did not premise his claim of trial counsel ineffectiveness upon a theory that counsel had available to him at the time of trial, and should have forwarded, an objection that the substantive due process guarantees of the Fourteenth Amendment expand upon the enumerated right to counsel and confer a pre-arrest right to consult counsel, such that the government in a criminal prosecution is precluded from arguing negative inferences from a pre-arrest legal consultation. Because appellee never challenged trial counsel's effectiveness on the basis of counsel's having overlooked a due process ground for arguing in favor of a pre-arrest right to counsel, the Superior Court erred in reversing the PCRA court and finding counsel ineffective on that basis.[12]

Our holding, that the panel's Fourteenth Amendment due process-based theory for finding counsel ineffective was

12. Appellee, who is represented by capable new counsel on appeal to this Court, recognizes that the substantive due process theory might be found waived and forwards a new, layered claim of ineffectiveness focusing on PCRA counsel's failure to raise that theory more effectively and specifically. Our discretionary grant of the Commonwealth's allocatur petition did not encompass such a new claim. Hence, it is not properly before this Court. Moreover, claims of PCRA counsel ineffectiveness may not be raised for the first time at the direct appeal level, much less at the discretionary appeal level. *See Commonwealth v. Pitts*, 981 A.2d 875, 880 n. 4 (Pa.2009).

not argued or preserved, dispenses with the necessity for addressing the merits of the Commonwealth's third claim. The question of whether substantive due process should embrace the expanded right recognized by the panel to consult counsel pre-arrest should await a case where such a claim is properly presented and preserved.[13]

The Commonwealth's remaining claim posits that the Superior Court erred in holding that the trial record alone was sufficient to prove that trial counsel's failure to object to the prosecutor's comments as a violation of due process could not have had a reasonable basis. The Commonwealth makes two basic points. First, echoing its position on the merits of the question whether due process prohibits commentary on pre-arrest legal consultations, the Commonwealth asserts that it was error to fault counsel where, at the time of trial, there was no controlling decision by the Superior Court, this Court, or the U.S. Supreme Court barring a prosecutor from commenting on a defendant's pre-arrest legal consultations. Given our finding above that the panel erred in finding counsel ineffective on this waived theory of objection, we will not pass upon this contingent argument. Second, the Commonwealth argues that the Superior Court compounded its error by finding counsel's failure to object *per se* unreasonable based simply on the trial record, and in the absence of any proffer concerning counsel's thought process or strategy or the state of the law at the time of trial.

On the question of the Superior Court's finding that the absence of a reasonable basis for counsel's conduct was discer-

13. We note, of course, that to the extent such a claimed right would be forwarded in the context of a claim of ineffective assistance of counsel, care must be taken to recognize the limits on finding counsel ineffective premised upon hindsight evaluation. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."); *see also Commonwealth v. Todaro,* 549 Pa. 545, 701 A.2d 1343, 1346 (1997) ("[C]ounsel's stewardship must be judged under the existing law at the time of trial and counsel cannot be deemed ineffective for failing to predict future developments or changes in the law.").

nible as a matter of law from the trial record, appellee's response is tied to his position that the panel's adoption of a Fourteenth Amendment theory of objection was proper. Appellee argues in essence that where (as he believes) the basis for objection is obvious and meritorious, and the prejudice is apparent, a holding of ineffectiveness may be proper even without hearing counsel's response to the accusation.

The Commonwealth replies that appellee has provided no viable authority for the proposition that trial counsel's performance may be found *per se* unreasonable without first determining the basis for counsel's strategy. The Commonwealth further notes that during the pendency of this appeal, trial counsel contacted the Commonwealth and submitted an unsolicited affidavit, which the Commonwealth attaches as an Appendix to its Reply Brief. According to the Commonwealth, the affidavit reveals a reasonable basis for trial counsel's actions. The Commonwealth recognizes that this affidavit is *dehors* the record, but argues that its existence impeaches the panel's finding of *per se* unreasonableness without hearing from counsel. Appellee has filed a motion to strike this Appendix, since it is not part of the record on appeal.

The Superior Court's assumption that it is appropriate for an appellate court to find trial counsel's conduct or strategy *per se* unreasonable in an instance where the defendant makes no attempt to account for counsel's response to the accusation is problematic. As a general rule, a lawyer should not be held ineffective without first having an opportunity to address the accusation in some fashion. Of course, there may be cases where the absence of a reasonable strategy is uncontested, and there may be instances where trial counsel is deceased or unavailable for another reason. But this is not such a case. The ultimate focus of an ineffectiveness inquiry is always upon counsel, and not upon an alleged deficiency in the abstract. Furthermore, it is particularly problematic to render an appellate finding of *per se* unreasonableness in a case where the PCRA judge, whose decision was under review, discerned a reasonable strategy from the trial

record alone and, for good measure, the PCRA judge also presided at trial. At a minimum, these circumstances should at least have given the panel pause before rendering its *per se* finding.

More problematically, the panel's justification for its *per se* holding is in substantial tension with this Court's precedent. The panel cited a single case from this Court, *Commonwealth v. Costa*, 560 Pa. 95, 742 A.2d 1076 (1999), which involved a claim of trial counsel ineffectiveness for failing to object to improper prosecution commentary upon the defendant's post-arrest silence. The panel saw "little distinction" between post-arrest silence cases and this case.

The *Costa* Court divided 4–3 on the question of whether counsel had a reasonable basis in failing to object to the prosecution's reference. The *Costa* majority's entire discussion of the point was as follows: "Trial counsel failed to object to this impermissible reference to appellant's post-arrest silence. No reasonable basis exists for that failure." *Id.* at 1077. The majority did not purport to declare that there could never be a reasonable basis for failing to object to such references; it decided that there was no existing reasonable basis in that case, with no further elaboration.

More importantly, even if *Costa* supported the panel's broader reading, *Costa* was not this Court's most recent authority on the propriety of holding counsel ineffective without a hearing or other account of counsel's response to the claim. Indeed, *Costa* is not even this Court's most recent authority on this issue in the context of objectionable references to post-arrest silence. In *Commonwealth v. Spotz*, 582 Pa. 207, 870 A.2d 822 (2005), *cert. denied*, 546 U.S. 984, 126 S.Ct. 564, 163 L.Ed.2d 474 (2005), we addressed this very point at length, making clear this Court's strong preference that counsel be heard from before being found ineffective:

In recent years, this Court has expressed a distinct preference for a hearing on counsel's strategy before venturing to hold that counsel lacked a reasonable basis for his or her actions or inactions. *See, e.g., [Commonwealth v.] Gribble,*

[580 Pa. 647] 863 A.2d [455,] 473–74 [ (Pa.2004) ] (error for PCRA court to hold counsel ineffective in permitting client to waive penalty phase jury without first holding evidentiary hearing); *Commonwealth v. Hughes*, [581 Pa. 274] 865 A.2d 761, 799 (Pa.2004) (although there did not appear to be a reason for counsel's failure to pursue claim of arguable merit, since there had been no hearing, "we cannot discern whether a reasonable basis existed for counsel's omission. In such circumstance, this Court has declined to divine, in the first instance on appellate review, whether counsel's actions were reasonably based") (citing *Commonwealth v. Duffey*, [579 Pa. 186] 855 A.2d 764, 775 (Pa.2004)). *Duffey* is particularly notable because the claim of counsel ineffectiveness there, as here, sounded in a failure to object to a reference to post-arrest silence. Although this Court found that the claim had arguable merit and that the objectionable reference was prejudicial, we remanded for a determination of a reasonable basis, noting that in the absence of testimony from counsel, the court "should refrain from gleaning whether ... a reasonable basis exists." *Id.* (citing *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014, 1022 (2003)) (court should resolve question of reasonable basis for counsel's actions in absence of evidentiary hearing only when answer is clear from record). *Accord Commonwealth v. Turner*, 469 Pa. 319, 365 A.2d 847, 849 (1976).

In the case *sub judice*, it cannot be said as a matter of law that counsel lacked a reasonable basis for failing to object to the prosecutor's temporal references on cross-examination. Review of the reasonableness of counsel's trial performance is not measured by an exercise in "spot the objection," as might occur in a law school evidence examination. Counsel are not constitutionally required to forward any and all possible objections at trial, and the decision of when to interrupt oftentimes is a function of overall defense strategy being brought to bear upon issues which arise unexpectedly at trial and require split-second decision-making by counsel. The fact that an appellate court, reviewing a cold trial record, cannot prognosticate a reasonable basis for a partic-

ular failure to raise a plausible objection does not necessarily prove that an objectively reasonable basis was lacking. Objections sometimes highlight the issue for the jury, and curative instructions always do. Particularly in a case such as this, where the general line of questioning concerning flight and post-incident behavior was legitimate to rebut the justification defense, and only the proper temporal bound was crossed, counsel could believe that it was better not to call attention to the temporal limitation and to let his client explain himself. *See Commonwealth v. Whitney*, 550 Pa. 618, 708 A.2d 471, 478 (1998). It may be that counsel believed that his client acquitted himself well in his response. . . .

\* \* \*

The deference to trial counsel that is required under *Strickland* and *Pierce* is a deference that arises from an appreciation of the art involved in the practice of law generally, and in the defense function particularly. This is not to say that there is no instance where the failure to object could be deemed unreasonable as a matter of law. But, such is the exception and not the rule; at least as a general principle, counsel should have a chance to be heard before being declared ineffective. Absent a hearing at which counsel's actual reasons for failing to object may be explored, this is not a case where it can be said, as a matter of law, that there cannot have been a reasonable basis for failing to object.

870 A.2d at 832–33 (footnote omitted). *Accord Massaro v. United States*, 538 U.S. 500, 504–05, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003).

*Spotz* and the reasoned decisions discussed in the above excerpt constitute the governing law on this question. The panel's failure to recognize and apply these principles before proceeding to find counsel's conduct unreasonable on the basis of the bald trial record was erroneous.

██ We turn next to the Commonwealth's attaching to its reply brief an affidavit from trial counsel addressing his trial

strategy and appellee's motion to strike the affidavit since it is not of record. As noted above, the PCRA court found an objective reasonable basis in the record for trial counsel's strategy respecting appellee's pre-arrest conduct, while the Superior Court panel, looking at the same record (albeit considering a different foregone objection) concluded that counsel's failure to object could not have been based on a reasonable strategy. The prime difficulty and strategic challenge facing trial counsel in this case was that a great deal of appellee's post-shooting conduct—not just his consultation with counsel, but his flight, his failure to render or call for assistance, his taking the gun and the spent shell with him and disposing of that crucial evidence—undercut the defense's narrative that appellee was an innocent man who had just witnessed what he claimed was the tragic, accidental, self-inflicted death of a person with whom he was in an intimate encounter. Appellee's contacting a lawyer when and how he did was a revealing part of that conduct, but not the only part. Notwithstanding this circumstance, appellee's PCRA petition and memorandum in support made no proffer concerning what trial counsel would say in response to appellee's claim.

Absent non-objection or concession by the Commonwealth, or an unusual circumstance where unreasonableness could be presumed, appellee's failure of proffer and proof could prove fatal to his claim. Notwithstanding this fact, however, the PCRA court did not dismiss the claim based upon a failure of proffer—a holding which may have opened the door to appellee amending his petition and addressing the lapse. *See* Pa.R.Crim.P. 907. Instead, the court discerned an objective reasonable basis, in the absence of counsel's account, from the record alone.

 The Commonwealth, of course, has no burden of proof where a defendant raises a claim of counsel ineffectiveness—albeit there is nothing to prevent the Commonwealth from responding to a claim of ineffectiveness by producing the account, or testimony, of actual trial counsel. In this case, the Commonwealth became aggrieved by the Superior Court panel finding counsel's conduct unreasonable as a matter of law,

holding that there was no necessity to hear from counsel, thereby absolving appellee of his burden, and rejecting the Commonwealth's waiver argument. As a general matter, we see nothing in law or logic to prevent the Commonwealth, once aggrieved in this fashion, from attempting to address a PCRA petitioner's lapse by itself accounting for what trial counsel would say. Furthermore, we note that this Court has considered affidavits and other proffers forwarded on appeal in connection with claims of ineffective assistance. In *Commonwealth v. Ligons*, 601 Pa. 103, 971 A.2d 1125, 1154–55 & n. 26 (2009), the lead opinion by Mr. Justice Baer reviewed "a variety of records and reports, which were not presented to the PCRA court," in addressing the appellant's new claim that his PCRA counsel was ineffective in his presentation of mitigation evidence to prove trial counsel ineffective. *See also, e.g., Commonwealth v. Hall*, 582 Pa. 526, 872 A.2d 1177, 1188 & n. 10 (2005) (considering non-record declarations); *Commonwealth v. Brown*, 582 Pa. 461, 872 A.2d 1139, 1147 n. 5 (2005) (in case involving layered claim of ineffective assistance of counsel, court considered "declaration" from trial counsel, which was attached to appellant's reply brief, over government's objection); *Commonwealth v. Jacobs*, 556 Pa. 138, 727 A.2d 545, 550 (1999) (considering affidavits attached to appellate brief in attempt to prove layered ineffectiveness).

We need go no further than these general observations. Given our primary holding that the panel erred in finding counsel ineffective based upon a theory not presented to the PCRA court or on appeal, what remains is for the claim of ineffectiveness that appellee actually forwarded to be decided. That issue was not passed upon by the panel below, though it was fully briefed, and it has not been accepted for review or briefed here. Counsel's affidavit, if appropriately forwarded and relevant, is relevant only to consideration of the merits of that claim of ineffectiveness. In these circumstances, we will remand to the Superior Court for decision of the claim briefed to it, and we will deny appellee's Motion to Strike without prejudice to appellee renewing his objection before the Superi-

or Court, should the Commonwealth attempt to proffer the document.

For the foregoing reasons, we vacate the opinion and order of the Superior Court and remand the matter to that court for proceedings consistent with this Opinion. Appellee's Motion to Strike Appendix of Reply Brief is denied without prejudice, as explained above. Jurisdiction is relinquished.

Justices SAYLOR, EAKIN, BAER, TODD, McCAFFERY and ORIE MELVIN join the opinion.