J-A01040-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MARC C. DRAPER | |
| Appellant | No. 3019 EDA 2014 |

Appeal from the PCRA Order October 20, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0736231-1984

BEFORE:  LAZARUS, J., OTT, J., and STEVENS, P.J.E.*

MEMORANDUM BY LAZARUS, J.:                    **FILED MARCH 18, 2016**

Marc C. Draper appeals from the order of the Court of Common Pleas of Philadelphia County denying his third petition filed under the Post-Conviction Relief Act, 42 Pa.C.S. §§ 9541-46 ("PCRA").  We affirm.

On February 26, 1986, Draper entered a negotiated guilty plea to one count each of second-degree murder, robbery, and criminal conspiracy.  The charges stemmed from an incident where Draper and a co-defendant, Terrance Williams, robbed the victim, beat him with a tire iron and socket wrench, and doused him with gasoline and lit his body on fire at a Philadelphia cemetery.  The Honorable David N. Savitt accepted Draper's plea and sentenced him to life imprisonment for murder, and to a concurrent term of imprisonment of five to ten years' incarceration for conspiracy.  No

_____
*Former Justice specially assigned to the Superior Court.

further penalty was imposed for robbery. Draper did not seek to withdraw his guilty plea or file a direct appeal.

In May 2000, Draper filed his first PCRA petition, which the PCRA court dismissed as untimely. On appeal, this Court affirmed. *See Commonwealth v. Draper*, 809 A.2d 955 (Pa. Super. 2002) (unpublished memorandum). On October 31, 2003, Draper filed a second untimely petition, which the PCRA court dismissed on January 14, 2004. On appeal, this Court affirmed. *See Commonwealth v. Draper*, 867 A.2d 644 (Pa. Super. 2004) (unpublished memorandum).

Draper filed a *pro se* PCRA petition, his third, on September 6, 2012. He subsequently retained counsel, who, after seeking an extension, filed an amended petition on April 22, 2013. The Commonwealth filed a motion to dismiss. The PCRA court filed a notice of intent to dismiss pursuant to Pa.R.Crim.P. 907, and on October 21, 2014, the court dismissed Draper's third PCRA petition as untimely.

Draper raises the following issues for our review:

> 1. Did the PCRA court err when the court dismissed [Draper's] PCRA petition because [Draper] demonstrated he met one or more exceptions to the time bar?
>
> 2. Did the PCRA court err when the court dismissed [Draper's] petition because plea counsel was ineffective for advising [Draper] he had a right to parole when no such right existed?
>
> 3. Did the PCRA court err when the court dismissed [Draper's] petition because [Draper's] right to due process was violated when he entered a plea that was unknowing, unintelligent, and involuntary?

- 2 -

Draper argues plea counsel was ineffective and caused him to enter an unknowing, unintelligent and involuntary plea. He claims he was "promised" that his life sentence would be commuted after fifteen years.

Notably, Andrea Foulkes, the prosecutor in the Williams case, testified at co-defendant Williams' September 20, 2012 PCRA hearing. This testimony is included in the record herein as an exhibit to Draper's April 18, 2013 Amended PCRA Petition. Foulkes testified with respect to Draper's statement that he was told at the time of his guilty plea that he "would be eligible for parole after about 15 years[.]" PCRA Hearing-Commonwealth v. Williams, 9/20/12, at 17. She also testified with respect to Draper's statement, "The trial prosecutor [Foulkes] wrote a letter to the Parole Board explaining my cooperation."[1] Asked whether she agreed with these statements, Foulkes stated:

_____

[1] The letter, addressed to the Pennsylvania Board of Probation and Parole and dated June 23, 1988, provides:

> Re: Inmate Marc Draper
>
> To Whom It May Concern:
>
> At the request of the family of the above-name inmate, I am submitting the following information to them with instructions to forward it to you if and when this prisoner becomes eligible for parole or commutation of sentence.
>
> Marc Draper was the co-defendant of Terrance Williams and, with Williams, conspired and acted to abduct, rob and beat to death 56-year old Amos Norwood, inside the Ivy Hill Cemetery in the Mt. Airy section of Philadelphia. After tying the victim with

*(Footnote Continued Next Page)*

his own clothes and beating him with car tools, the co-defendants took his money, credit cards, and car, [and] obtained more money and jewelry with the stolen goods in Atlantic City and Philadelphia. Their spree was ended when credit card calls were traced by police to a third man who assisted the killers in obtaining these credit card benefits.

Mr. Draper was arrested in his home and Williams fled the jurisdiction upon issuance of warrants. On the day of his arrest, Mr. Draper completely and thoroughly confessed his participation in this hideous crime without any promise or benefits offered to him. In addition, he volunteered additional information about his co-defendant's responsibility for the murder of 53 year-old Herbert Hamilton in West Philadelphia six months earlier, which led to the arrest of Williams on that previously unsolved case. Draper offered to cooperate fully with the investigation and to testify truthfully in the prosecution of Williams, in both homicide cases, resulting in Williams' conviction in the earlier killing of murder in the third degree (Williams' defense was that the killing was provoked by homosexual advances of the victim), and a verdict of murder in the first degree with the penalty of death by the jury in the Norwood case. In addition, Draper agreed to plead guilty to murder in the second degree, knowing that it brought a mandatory life sentence, without any promise of leniency or early release.

Although the heinous nature of the underlying crime cannot be minimized in any way, Mr. Draper has attempted to compensate significantly for his role in this matter. While it is true that he has benefitted by avoiding the death penalty for himself, I was well aware that during the pendency of prosecutions against Williams, Mr. Draper was visited regularly in Holmesburg prison by Williams himself, at the gates of Draper's protective custody area, and by friends of Williams' inside Draper's cell. Thus, Mr. Draper's security in prison was never certain, yet he continued to see that justice was served in all matters in which he had information or connection.

I never had any reason to doubt Mr. Draper's veracity and he never declined to answer the most difficult questions about his own culpability. Williams sent Mr. Draper letters in prison with alternative stories to feed the authorities and the court about

*(Footnote Continued Next Page)*

There are two kinds of things that a prosecutor could do. One is a prosecutor can simply recount to the Parole Board what somebody has done, and that's a historical account of what they have done and it's a truthful account. The other is whether or not a prosecutor would actively ask the Parole Board to consider parole or – it's really commutation in a life sentence. It's not really parole. Consider commutation at an earlier point than a defendant might just apply for commutation of sentence in the ordinary course, whether they cooperated or not. So Mr. Draper had the same rights as any other life prisoner to apply at some point in the future for commutation of sentence. He could do that whether he cooperated or didn't cooperate. He could always do that. A prisoner can do that and a lot of whether a sentence is commuted has as much to do with who is the governor and what the Parole Board looks like or the Board of Pardons or whatever board is considering the commutation. So Mr. Draper was in no different position in that respect than any other lifer. . . . I have to think that I did or someone did say to him that at some time if he were to apply in the future for

*(Footnote Continued)* ────────────────

their criminal activities. Mr. Draper passed that correspondence on to his father, a Philadelphia police officer, with instructions to give them to the prosecutor in preparation for trial. Those letters, in addition to his oral testimony, established a compelling case against Williams, who had a frightening history for violent crimes.

Therefore, it is proper for you to consider the cooperation of this inmate when determining his eligibility for parole or commutation at some future date. That I provide you with the particulars of Mr. Draper's cooperation was the only benefit or promise conveyed to him in exchange for his complete truthful cooperation. I hope this information will be useful in your evaluations.

/s/ Andrea G. Foulkes, ADA, Homicide Unit

bcc: Mr. George Draper

Amended PCRA Petition, 4/18/13, Exhibit C (Foulkes Letter, 6/23/1988).

commutation, that we would tell the Parole Board historically what he did, that that would happen, but that we would not do anything to expedite the time . . . **No one promised him he would get paroled at any point. No one promised that.** A prisoner could apply for it, but he would never – we never promised him that he would get parole and I colloquied him on many occasions under oath that he understood that life meant life and that we were not doing anything more for him about changing that number and now he said – then he says: "I was just testifying as I was told to." No one told him how to testify at all. [With respect to his statement:] "They kept telling me that they would take care of it after I testified against Terry." I guess he's referring to getting paroled. Clearly that was never stated. . . . No one said anybody would take care of anything after he testified against Terry. The only thing that was conveyed to him that if he sometime in the future 30 years, 20 years – in fact, I seem to recall that back in the day, life prisoners might start making application for commutation if it was to be considered in possibility 20 years or 30 years. That doesn't mean it would be granted, it may never be granted, but whether they cooperated or not, they might do that, and what I said to him is if and when he should ever go through that process, we would let the Parole Board know that what he had done in this case, period.

*Id*. at 17-22 (emphasis added). The court questioned Foulkes regarding the benefit Draper received in exchange for testifying "against his friend from the third grade[.]" Foulkes stated: "Well, his deal was that he could plead to second[-degree murder] . . . in terms of if someday down the road he applies for commutation with no expedited date in mind, that he might get a little better consideration than someone who had a first-degree conviction." *Id.* at 29.

On cross-examination, the following exchange occurred with respect to the letter to the Parole Board:

Q:    And also he would tell the Parole Board down the road that he cooperated?  It's not just a second versus first; right?  It's I cooperated?

A:    Absolutely correct, and he could have done that and the Parole Board could have asked the District Attorney's Office at that point, well, what did that cooperation entail and someone in the District Attorney's Office, probably not me because it would be so long, I didn't expect to be around now, that someone would have to answer that question, which was the reason that when I got a call from George Draper who was Mr. Draper's father about two years after the conviction and he said, you know, you're probably not going to be in the DA's Office many years down the road when this comes up, can you write a letter that you send to me that I can hold for my son and I will tell you that I kept a copy of the letter with the inscription of what I did with this letter, sent original and one copy to Mr. George Draper and I put the address of where I sent it and I kept it in a file that I took with me and I turned over to the District Attorney just last week.  . . . . Two years after the letter was sent to Mr. Draper, I got a correspondence from an attorney for Marc Draper named John Manos who asked me, he said, "I'm attempting to assist the family of Marc Draper to continue his rehabilitation while in prison and when commutation or parole may become feasible to assist in that matter also."  So he was asking me –

       THE COURT: If he could use your letter.

A:    If he could use my letter.  So I wrote him back and I said that it may be used with my permission to the Board at such time, but[,] and it was with this understanding[,] I gave a letter to George Draper in 1988 since there was no guarantee I would still be in the District Attorney's Office at the time that such application might be considered, but then I said, "As I am sure you are aware, we made no promises to Marc that we could or would intervene to speed up the process of the Board's consideration of such an application."  So that if Mr. Draper is to be believed that I was in some kind of – doing some kind of secret deal, I surely would not have said that to his own lawyer four years after the fact because there would be no need to do that.  That's why I wanted to make sure that Mr. Manos knew that all along the line as [to] Mr. Draper, either he had a misunderstanding in the beginning, but it was corrected and he said over and over again under oath on the record that he

understood that **a life sentence was a life sentence** and that we were not going to do anything to speed up or expedite any commutation of his sentence. . . . As soon as at the earliest point that I had any inkling that Mr. Draper was under the impression from his attorney that this commutation process if it ever happens could happen as soon as ten years and that we would do something to make that happen, I corrected it. I wanted to make sure that he understood that that was not the case, it was never the deal it as not the promise and it wouldn't happen.

*Id*. at 29-33, 59 (emphasis added).

When reviewing denial of PCRA relief, we will not disturb the court's findings if they are supported by the record and free of legal error. ***Commonwealth v. Burkett***, 5 A.3d 1260, 1267 (Pa. Super. 2010). Further, we grant great deference to the factual findings of the PCRA court, and we will not disturb those findings unless they have no support in the record. ***Commonwealth v. Carter***, 21 A.3d 680, 682 (Pa. Super. 2011). However, we afford no such deference to its legal conclusions. ***Commonwealth v. Paddy***, 609 Pa. 272, 15 A.3d 431, 442 (2011); ***Commonwealth v. Reaves***, 592 Pa. 134, 923 A.2d 1119, 1124 (2007). Where the petitioner raises questions of law, our standard of review is *de novo* and our scope of review plenary. ***Commonwealth v. Colavita***, 993 A.2d 874, 886 (Pa. 2010).

A PCRA petition "must normally be filed within one year of the date the judgment becomes final . . . unless one of the exceptions in § 9545(b)(1)(i)-(iii) applies and the petition is filed within 60 days of the date the claim could have been presented." ***Commonwealth v. Copenhefer***, 941 A.2d

646, 648 (Pa. 2007) (citations and footnote omitted). A judgment of sentence becomes final "at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." 42 Pa.C.S. § 9545(b)(3).

Here, Draper's judgment of sentence became final on March 24, 1986, when his time for filing a direct appeal expired. Therefore, he had until March 24, 1987, to file a timely PCRA petition. As noted above, Draper filed the instant serial petition on April 22, 2013, over twenty-five years later, and is patently untimely.

An untimely petition renders this Court without jurisdiction to afford relief. *Commonwealth v. Gandy*, 38 A.3d 899 (Pa. Super. 2012).

> [W]hen a PCRA petition is not filed within one year of the expiration of direct review, or not eligible for one of the three limited exceptions, or entitled to one of the exceptions, but not filed within 60 days of the date that the claim could have been first brought, the trial court has no power to address the substantive merits of a petitioner's PCRA claims.

*Commonwealth v. Williams*, 35 A.3d 44, 53 (Pa. Super. 2011), citing *Commonwealth v. Gamboa-Taylor*, 753 A.2d 780 (Pa. 2000).

Draper attempts to place this claim within the "newly recognized constitutional right" exception to the PCRA time bar. *See* 42 Pa.C.S. § 9545(b)(1)(iii). He claims that the United States Supreme Court's decisions in *Missouri v. Frye*, 132 S. Ct. 1399 (2012) and *Lafler v. Cooper*, 132 S.

Ct. 1376 (2012) created a newly recognized constitutional right that was held to be retroactive. As the trial court pointed out, neither *Frye* nor *Lafler* is retroactive, nor is either case factually similar to Draper's case.

In *Frye*, the Court held that defense counsel has a duty to communicate to defendant the written plea offers from the prosecutor that are favorable to the accused. In *Frye*, those offers would have either recommended a lesser sentence than the four-year maximum sentence for the charged felony offense of driving with a revoked license, or would have allowed defendant to plead guilty to a misdemeanor, before the offers expired. *Frye*, 132 S. Ct. at 1408. Here, Draper makes no allegations that his plea counsel failed to communicate a plea offer from the prosecution. Rather, he claims a promise was made to him, that his life sentence would be commuted after fifteen years, and that this promise induced him to enter a negotiated guilty plea. However, no record of such a promise exists. Accordingly, *Frye* does not provide Draper with an exception to the time bar.

In *Lafler*, the Court held the petitioner was prejudiced by counsel's deficient performance in advising the petitioner to reject the plea offer and go to trial. *Lafler*, 132 S. Ct. 1376. Unlike *Lafler*, here Draper did not reject a plea offer and proceed to trial, but entered a favorable guilty plea and now claims that he did so because his plea counsel provided ineffective

assistance during the plea-bargaining process.[2]   Thus, the facts of the instant case render **_Lafler_** inapposite.

_____

[2] At the guilty plea colloquy, the following exchange took place:

> THE COURT:  Now, I understand and Miss Foulkes has indicated that this is a negotiated plea, and she has indicated on the record that the negotiations are that she is asking this Court to accept the plea to murder in the second degree, and she is asking this Court to accept the plea as to guilty to robbery and conspiracy, and that she will ask the court to sentence you to life imprisonment for second degree.  She suggests that the sentence for robbery merges so that there will not be an increased sentence, and she suggests that the Court sentence the defendant to five to ten years for conspiracy but that this be concurrent, which means that the sentence be served at the same time as the life sentence is being served, and that is the extent of the negotiations.  Is that your understanding of it?
>
> THE DEFENDANT:  Yes.
>
> * * *
>
> THE COURT:      **Mr. Draper, there were no other promises made to you, were there?**
>
> THE DEFENDANT:  **No**.
>
> THE COURT:      And no one else said they would make any other recommendations.  Is that correct?
>
> THE DEFENDANT:  Yes.
>
> THE COURT:      **Has anyone promised you anything other than what I have just set forth?**
>
> THE DEFENDANT:  **No.**
>
> * * *
>
> THE COURT:      I am going to accept the plea.  I want to tell you this so it's crystal clear, there is little question in my mind that this case, if this case was tried before a jury as the Willliams

_(Footnote Continued Next Page)_

Moreover, this Court has recently concluded that neither *Frye* nor *Lafler* created a new constitutional right. In *Commonwealth v. Feliciano*, 69 A.3d 1270, 2013 (Pa. Super. 2013), we stated:

> "The right to effective assistance of counsel during the plea bargaining process has been recognized for decades." *Commonwealth v. Lewis*, 2013 PA Super 62, 63 A.3d 1274, 1280 (Pa. Super. 2013) (citing *Hill v. Lockhart*, [*supra*]; *Padilla v. Kentucky*, 559 U.S. 356, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010) ("Before deciding whether to plead guilty, a defendant is entitled to the effective assistance of competent counsel.")). . . . It is apparent that neither *Frye* nor *Lafler* created a new constitutional right. Instead, these decisions simply applied the Sixth Amendment right to counsel, and the *Strickland* test for demonstrating counsel's ineffectiveness, to the particular circumstances at hand.

*Feliciano*, 69 A.3d at 1276–77 (footnote omitted). *See also Commonwealth v. Hernandez*, 79 A.3d 649 (Pa. Super. 2013).

We conclude, therefore, that because both *Lafler* and *Frye* are factually distinct from the case before us, and do not recognize a new constitutional right, Draper's attempt to satisfy the PCRA's "newly recognized

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯

> case was or a waiver, that you could very easily be found guilty of murder in the first degree, and I would not speculate as to whether the sentence would be death or life imprisonment because I really don't have before me at this point any information concerning whether there were aggravating circumstances other than what appears [from] the record. . . . I want to make it clear that you could be found guilty, could easily be found guilty of first-degree murder, and that the possibility of a death penalty is certainly within the realm of contemplation.

N.T. Guilty Plea, 2/21/1986, at 14-15 (emphasis added).

constitutional right" exception fails. Foulke's testimony, and her letter to the Board of Probation and Parole, do not, as Draper argues, "demonstrate that [he] was deceived by off-the-record promises[,]" nor does it "corroborate[ his] claim [that] the Commonwealth wrongfully induced his plea through illusory promises." Appellant's Brief, at 12. We are unable to conclude that Draper's claim that he was "promised" that his sentence of life imprisonment meant eligibility for parole after serving 15 years, or that he entered his plea based on the Commonwealth's representations that he would not serve a life sentence, are supported in the record.[3] **_Burkett_**, **_supra_**. Despite Draper's claim that this was a "material term" to his plea agreement, there is neither mention of it during the guilty plea colloquy nor evidence of it anywhere in the record. Thus, the PCRA court did not err in finding that no exception to the time-bar applied, and the court properly dismissed Draper's petition as untimely.

Order affirmed.

_____

[3] Draper testified at the PCRA hearing that Kenneth Dixon, Esquire, represented him early in the case, prior to his guilty plea hearing. He stated that Dixon and Foulkes told him he would get paroled. PCRA Hearing, 9/20/12, at 194. At the guilty plea hearing, Draper was represented by Harry Seay. When asked if Attorney Seay ever said anything about parole, Draper responded, "I might have said two words to Harry Seay." **_Id_**. Attorney Dixon passed away in 1996.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>3/18/2016</u>