J-S42002-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA,

Appellee

v.

DEREK RUSSELL JONES,

Appellant

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 117 WDA 2015

Appeal from the PCRA Order June 15, 2011
In the Court of Common Pleas of Allegheny  County
Criminal Division at No(s): CP-02-CR-0000266-2003, CP-02-CR-0001438-2003

BEFORE:  SHOGAN, OTT, and FITZGERALD,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED JUNE 14, 2016**

Appellant, Derek Russell Jones, appeals from the order denying his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546.  We affirm.

The relevant facts underlying Appellant's convictions were set forth by the trial court as follows:

> On December 15, 2002, three (3) men, including [Appellant], entered Big Dawg's bar in the Beechview section of Pittsburgh and proceeded to play pool, at approximately 11:00 p.m. Moments later, an argument was heard by Timothy Fritz, a patron of Big Dawg's that night. One of the person[s] identified as being involved in the heated argument was [Appellant]. The bartender, Jessica Foster, testified to receiving a complaint from Rashad Jackson, another patron at the bar, that one of the three men was carrying a gun. A witness Daniel Espy testified to

---

[*]  Former Justice specially assigned to the Superior Court.

seeing [Appellant] carrying a gun in his waistband at this time. A witness named Dorian Fancher identified Rashad Jackson and Daniel Espy as the two others involved in the argument. Two men identified only as 'Joe' and 'Tank' entered the bar and broke up the argument in the pool room. The group of men, which included [Appellant], w[as] asked to leave the establishment by 'Joe' and 'Tank'. Pittsburgh Police came in response to a call by the manager and shortly, thereafter, left [a]s the disturbance had ended.

The group of men left the bar and went to the residence of Corey Thomas in the Beechview neighborhood of Pittsburgh. Keith Neil Ferguson testified that Jason Bottoms, [Appellant], Alphonzo Peoples, and another person were also present in the residence. Ferguson testified that they all made a decision to go back to Big Dawg's and fight. Ferguson also testified to hearing [Appellant] say that he wanted to get a 'burner' (gun). Later that same evening a group of people including [Appellant], Alphonzo Peoples and another person w[as] seen entering Big Dawg's bar a second time.

A second argument ensued, which involved the same people as earlier in the evening. Again, 'Joe' and 'Tank' proceeded to the pool room in the bar to break up the argument. A fight then broke out which involved 'Joe' and 'Tank' along with those participating in the argument. Fists were thrown and 'Joe' was knocked to the ground. Timothy Fritz then attempted [to] grab 'Joe' but fell against a wall. Timothy Fritz heard a gunshot fired. Timothy Fritz then identified a man standing on a barstool with a gun. This man was identified as [Appellant]. At this time, Jason Bottoms heard the deceased Rashad Jackson say 'I'm Hit'. Timothy Fritz then ran behind the other end of the bar, heard another shot and moments later saw [Appellant] sweeping the gun across the room. Mr. Fritz then saw [Appellant] fire a couple shots into the ceiling. Fritz felt his arm fall to his side and realized he had been shot. Timothy Fritz testified that it is unlikely if he will ever get complete physical use of his hand back as a result of the gunshot wound. [Appellant] fled the bar before police arrived.

City of Pittsburgh police officer Richard Colaizzi arrived on the scene of the shooting and found Dorian Fancher with a graze wound on his head. Later, Pittsburgh Police Detective Magee found two (2) copper jacket bullet fragments, five (5) 9mm

casings, and one (1) .22 caliber casing. There were two bullet holes in the ceiling but the officer was not able to retrieve any bullet fragments from those holes. Jason Bottoms testified that [Appellant] was known to carry a .22 caliber gun in his waistband.

On December 17, Wanda Fitzgerald gave permission to Pittsburgh police officer George Trosky to search her residence. During the search [Appellant] was found hiding in the basement. In the search of Wanda Fitzgerald's residence a .22 revolver was found behind the furnace in the basement by Officer Jesse Meyers. Deborah Chalkos, a criminalist at the Allegheny County Crime Lab, testified that the gun found at Mrs. Fitzgerald's home matched the .22 cartridge fired at Big Dawg's. Also, she testified that the bullet recovered from Rashad Jackson's body had the same rifling characteristics as the type of gun recovered when [Appellant] was arrested. The bullet examined by Deborah Chalkos had a distinctive brass-wash as did the .22 cartridge that was recovered at the scene of Big Dawg's.

Trial Court Opinion, 12/30/05, at 2-5 (internal citations omitted).

On October 22, 2003, Appellant pled *nolo contendere* to one count of criminal homicide, which, following a degree-of-guilt hearing, was graded as third-degree murder. Appellant pled guilty to one count of persons not to possess a firearm and one count of firearms not to be carried without a license. Appellant then proceeded to a bench trial on two charges of aggravated assault and one count of conspiracy to commit third-degree murder. At the conclusion of the bench trial, Appellant was found guilty of one count of aggravated assault and one count of conspiracy. Following all of these convictions, the trial court sentenced Appellant to an aggregate term of thirty-one to sixty-two years of incarceration.

Appellant filed a timely appeal and on October 24, 2006, this Court affirmed Appellant's judgment of sentence, and the Pennsylvania Supreme Court denied further review on April 3, 2007. ***Commonwealth v. Jones***, 80 WDA 2004, 913 A.2d 942 (Pa. Super. filed October 24, 2006) (unpublished memorandum), *appeal denied*, 591 Pa. 724 (Pa. 2007). Appellant filed a timely PCRA petition on May 12, 2008.[1] The PCRA court appointed counsel who filed a ***Turner/Finley***[2] no-merit letter and requested to withdraw. The PCRA court permitted counsel to withdraw and dismissed Appellant's PCRA petition June 15, 2011.

Appellant filed a timely *pro se* notice of appeal on July 12, 2011. However, Appellant's *pro se* appeal form was deemed incomplete, and the Allegheny County Clerk of Records, Criminal Division, directed Appellant to amend his notice of appeal and add the information that was missing. Letter, 7/13/11. The Superior Court Office of the Prothonotary directed the Allegheny County Clerk of Records to return the appeal to Superior Court once Appellant made the requested amendments. Letter, 10/5/11.

---

[1] As noted, the Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal on April 3, 2007. Appellant's judgment of sentence became final ninety days later on July 2, 2007, when the time for pursuing a writ of *certiorari* in the United States Supreme Court expired. 42 Pa.C.S. § 9545(b)(3); United States Supreme Court Rule 13. Appellant then had one year, until July 2, 2008, to file a timely PCRA petition. 42 Pa.C.S. § 9545(b)(1).

[2] ***Commonwealth v. Turner***, 544 A.2d 927 (Pa. 1988), and ***Commonwealth v. Finley***, 550 A.2d 213 (Pa. Super. 1988) (*en banc*).

Appellant avers that he never received notice that his appeal form was incomplete. Appellant's Brief at 6. Appellant subsequently filed a second notice of appeal on March 21, 2012, and a second PCRA petition on August 14, 2014. The PCRA court appointed counsel, and it appears that the duplicative PCRA petition and appeal were dismissed. Order, 4/28/15. This enabled Appellant to amend and proceed with his timely-filed July 12, 2011 appeal that had never been disposed of and remained pending before this Court. While this procedural history is convoluted, we are satisfied that Appellant filed a timely appeal from the June 15, 2011 order denying his first PCRA petition. The matter is now ripe for disposition.

On appeal, Appellant raises the following issues for this Court's consideration:

> 1. Did the trial court err in denying Appellant's PCRA petition since Appellant's nolo contendere plea to homicide at 266-2003 was involuntary since trial counsel [Robert] Foreman was ineffective for misrepres[e]nting the factual circumstances of the case and failing to inform Appellant that there was no evidence which would have supported voluntary or involuntary manslaughter verdicts; if Appellant had been so informed, he would not have pled to the homicide charge?
>
> 2. Did the trial court err in denying Appellant's PCRA petition since trial counsel [Robert] Foreman was ineffective for coercing Appellant to waive his right to a jury trial?

Appellant's Brief at 3 (full capitalization omitted).

Our standard of review of a PCRA court's denial of a petition for collateral relief is set forth as follows:

"Our review of a PCRA court's decision is limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error." **Commonwealth v. Hanible**, 612 Pa. 183, 204, 30 A.3d 426, 438 (2011) (citing **Commonwealth v. Colavita**, 606 Pa. 1, 21, 993 A.2d 874, 886 (2010)). We view the findings of the PCRA court and the evidence of record in a light most favorable to the prevailing party. **Id**. . . . "The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions." **Commonwealth v. Roney**, 622 Pa. 1, 16, 79 A.3d 595, 603 (2013).

**Commonwealth v. Mason**, 130 A.3d 601, 617 (Pa. 2015).

To plead and prove ineffective assistance of counsel, a petitioner must establish: (1) that the underlying issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice resulted from counsel's act or failure to act. **Commonwealth v. Stewart**, 84 A.3d 701, 706 (Pa. Super. 2013) (*en banc*). Failure to establish any one of these prongs will defeat an ineffectiveness claim. **Mason**, 130 A.3d at 618.

Appellant first argues that his *nolo contendere* plea to homicide was involuntary because his plea counsel never informed him that the evidence would not support a conviction for voluntary or involuntary manslaughter. Appellant's Brief at 23. We find that Appellant's argument is speculative and unsupported by the record.

As noted above, Appellant and his cohorts engaged in a heated altercation with another group at Big Dawg's bar. N.T., 10/22-23/03, at 46-

- 6 -

50. The altercation became physical and shots were fired. *Id*. at 50. Following the initial gunshots, Rashad Jackson suffered a fatal gunshot wound. *Id*. at 53, 185. More shots were fired, and witness Timothy Fritz saw Appellant firing his weapon into the ceiling. *Id*. at 56. Thus, while the witness saw Appellant fire his weapon, he did not see Appellant shoot Rashad Jackson.

In arguing the degree of guilt issue, Appellant's counsel asserted that Appellant's conduct was in self-defense or at worst, it was reckless; *i.e.*, he had no intent to kill. N.T., 10/22-23/03, at 377. Thus, contrary to Appellant's argument on appeal, the defense strategy had the potential to cause the trial court to grade the homicide as voluntary manslaughter. ***See Commonwealth v. Bracey***, 795 A.2d 935, 947 (Pa. 2001) (discussing lack of intent to kill and imperfect self-defense resulting in a voluntary manslaughter verdict). Simply stated, a verdict of manslaughter was possible. The fact that the trial court ultimately graded the homicide as third-degree murder does not render counsel ineffective. ***See Commonwealth v. Barnett***, 121 A.3d 534, 540 (Pa. Super. 2015) (explaining that counsel's decisions will be considered reasonable if they effectuated his client's interests, and this Court does not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken).

Moreover, Appellant stated on the record that he was aware the homicide charge could be graded at levels that varied from involuntary manslaughter to first-degree murder. N.T., 10/22-23/03, at 5. Therefore, Appellant knew that he was subject to a wide range of criminal culpability and possible sentences. *Id*. at 5-9. Appellant cannot reasonably argue that a conviction for voluntary or involuntary manslaughter was impossible and that he was induced into entering an involuntary plea on this basis. Appellant's argument that counsel was ineffective for failing to inform him that he had "no chance" of the trial court grading the homicide as voluntary or involuntary manslaughter is meritless. Appellant's Brief at 29. Accordingly, Appellant's first claim of ineffective assistance of counsel fails. *Stewart*, 84 A.3d at 706.

Next, Appellant argues that trial counsel was ineffective because he coerced Appellant into waiving his right to a jury trial. Appellant's Brief at 29. Appellant claims that his trial counsel told him that counsel was friends with the judge. *Id*. at 31. Appellant avers that counsel represented to him that if he pled guilty, he would receive a lesser sentence, but if he opted for trial, he would be sentenced to life in prison. *Id*. After review, we conclude this issue lacks merit.

> When a criminal defendant opts to waive his right to a jury trial:
>
> The judge shall ascertain from the defendant whether this is a knowing and intelligent waiver, and such colloquy shall appear on the record. The waiver shall be in writing, made a part of the record, and signed by the defendant, the attorney for the

- 8 -

Commonwealth, the judge, and the defendant's attorney as a witness.

Pa.R.Crim.P. 620.

As noted above, Appellant waived his right to a jury trial by pleading *nolo contendere* on the homicide charge, pleading guilty to the firearms violations, and selecting a bench trial on the aggravated assault and conspiracy charges. However, the trial court explained Appellant's rights, the charges, and potential sentences, and the trial court carefully inquired into the voluntary nature of Appellant's waiver of his right to a jury trial. N.T., 10/22-23/03, at 3-30. During this colloquy, the trial court also asked Appellant whether he was waiving his right to a jury trial voluntarily or if he had been promised a particular result:

> THE COURT: Did anybody say there would be a particular result from the Court or from the Commonwealth or from anyone with regard to the disposition of these charges by your giving up your right to a jury trial on all these charges?
>
> [Appellant]: No, sir.

*Id*. at 20.

Appellant is bound by the statements he made.

> The longstanding rule of Pennsylvania law is that a defendant may not challenge his guilty plea by asserting that he lied while under oath, even if he avers that counsel induced the lies. A person who elects to plead guilty is bound by the statements he makes in open court while under oath and he may not later assert grounds for withdrawing the plea which contradict the statements he made at his plea colloquy. A criminal defendant who elects to plead guilty has a duty to answer questions truthfully. We cannot permit a defendant to postpone the final

disposition of his case by lying to the court and later alleging that his lies were induced by the prompting of counsel.

***Commonwealth v. Turetsky***, 925 A.2d 876, 881 (Pa. Super. 2007) (citations omitted).

After review, we conclude that Appellant voluntarily waived his right to a jury trial. Moreover, Appellant specifically stated that his waiver was voluntary; he may not now rescind that testimony or assert that he lied about the veracity of his statement. Accordingly, Appellant's claim that he was coerced into waiving his right to a jury trial is meritless.

For the reasons set forth above, we discern no error in the PCRA court's denial of Appellant's PCRA petition. Therefore, we affirm.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/14/2016