J-A27006-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| OLAYIWOLA HOLLIST | |
| Appellant | No. 2960 EDA 2015 |

Appeal from the PCRA Order September 1, 2015
In the Court of Common Pleas of Northampton County
Criminal Division at No(s): CP-48-CR-0004109-2010

BEFORE:  PANELLA, J., LAZARUS, J., and FITZGERALD, J.[*]

MEMORANDUM BY PANELLA, J.                **FILED FEBRUARY 06, 2017**

Appellant, Olayiwola Hollist, appeals from the order that dismissed his petition pursuant to the Post Conviction Relief Act ("PCRA"). Hollist contends that the PCRA court erred in concluding that his appointed trial counsel were not ineffective in allowing him to waive his right to a jury trial and by not requesting that the trial judge recuse himself. After careful review, we affirm.

We summarized the facts of this case on direct appeal as follows.

[Hollist] was charged with three counts of Criminal Homicide and three counts of Conspiracy to Commit Criminal Homicide. The charges arose out of the execution-style triple homicide that occurred during the early morning hours of November 29, 2007, in Kim Slack's apartment located on the second and third floors

_____

[*] Former Justice specially assigned to the Superior Court.

of 128 North 13th Street, Easton, Pennsylvania. The three victims, Alphie Rene ("Rene"), Aleah Hamlin ("Hamlin") and Chanel Armour ("Armour"), were shot and killed in a bedroom located on the third floor of the building. The Commonwealth's theory, based upon witness statements, was that four assailants came into the backdoor to the apartment located on the second floor. Three of the assailants ran up the interior stairs of the apartment to a third floor bedroom. The victims were killed by bullets shot from two separate handguns (a .380 High Point and a 9 millimeter). All of the bullets and casings located at the crime scene confirm that only two weapons were fired. The evidence which led to the eventual identifications and arrests of the accomplices was gathered over a period of time.

The four accomplices eventually identified by the Commonwealth are [Hollist], Demar Edwards ("Edwards"), Ali Elijah Davis ("Davis"), and Lewis Gray ("Gray").

Davis was the first arrested. The Commonwealth sought the death penalty against Davis. In fact, Davis was arrested, tried and convicted prior to the arrest of Edwards and Hollist. Davis was found guilty of three counts of First-Degree Murder and Conspiracy to Commit Murder, however, the jury did not impose the death penalty. Davis is now serving three consecutive life sentences imposed on January 27, 2010. During the Davis trial, the Commonwealth's evidence established that Davis was one of the four assailants who came into the apartment. However, we note that there were no eyewitnesses who could identify which of the three assailants ran up the stairs. The Commonwealth argued to the jury that the circumstantial evidence established that Davis was one of the three assailants who ran up the stairs and likely was one of the shooters. In the alternative, the Commonwealth argued that Davis was guilty under the theory of accomplice liability.

Gray was the second accomplice arrested. Gray pleaded guilty, with a sentence bargain, to three counts of Criminal Conspiracy Engaging – Criminal Homicide and was sentenced to 13-26 years' confinement on May 5, 2010. As part of Gray's negotiated plea, he provided a statement to the Commonwealth regarding his participation in the murder of the victims and he confirmed the identity of the remaining assailants who remained at large.

[Hollist] was arrested on August 12, 2010, and Edwards on September 1, 2010. Both were arrested in New Jersey and extradited to Pennsylvania. [Hollist] provided a series of statements to the police regarding his version of the events of November 28, and 29, 2007.

The Commonwealth filed a Motion for Joinder on December 20, 2010, seeking to join the trials of [Hollist] and Edwards. [Hollist] filed Omnibus Pre-Trial Motions of February 4, 2011. [Hollist's] motions included a Motion to Suppress Statements, a Petition for *Habeas Corpus* and Motion to Dismiss, a Motion to Dismiss Aggravating Factor, a Motion to Preclude Discharge of Jurors that Object to the Imposition of the Death Penalty, a Motion to Challenge the Array and Composition of the Jury Panel, and a Motion to Challenge the Constitutionality of 42 Pa.C.S. § 4502. The Court denied [Hollist's] Motions and granted the Commonwealth's Motion to join the trials of [Hollist] and Edwards.

Prior to the commencement of the joint trial, [Hollist and Edwards] and the District Attorney reached a hybrid/negotiated resolution with regard to the death penalty. In return for [Hollist's and Edward's] waiver of their right to a jury trial, the District Attorney agreed not to pursue the death penalty. The non-jury trial began on October 31, 2011.

During the joint trial of Edwards and [Hollist], the Commonwealth presented various police officers who testified as to their various roles in the investigation; eyewitnesses present in the apartment – Josh Oliver ("Oliver"), Kim Slack ("Slack"), and Georgina Bricker ("Bricker"); one eyewitness to the actual shootings – Gray; and testimony from Romel Thompson ("Thompson") involving background testimony related to [Hollist and Edwards], the events of November 28, 2007, … Davis'[s] vehicle leaving from Newark, New Jersey, for Easton, and alleged admissions made after the homicides, separately by Edwards and [Hollist], to Thompson. In addition, the Commonwealth and [Hollist and Edwards] agreed to submit portions of the testimony of Lakindel Spring ("Spring") from the Davis trial. The parties stipulated that Spring was unavailable to testify at the time of trial.

- 3 -

The Commonwealth also presented the redacted statement of [Hollist]. There was nothing in [Hollist's] redacted statement which identified Edwards as a participant in the homicides.

Finally, The Commonwealth's presentation also included evidence regarding the location of Davis'[s] car as the four assailants allegedly travelled from Newark to the crime scene in Easton and back to Newark. The evidence included photographs of Davis's car at the Easton Toll bridge and forensic evidence tracing the assailants' cell phones (cell tower) activity as they used their cell phone in [sic] route.

The Commonwealth's theory was that the killings were gang related with Davis, Oliver, Edwards, [Hollist], Gray, and Thompson belonging to one "Blood" sect. Spring and Rene were alleged to be members of a different "Blood" sect. Rene's execution was allegedly retaliation related to an intra-Blood dispute.

Oliver, now a purported "former" Blood gang member, acknowledged that he was a member of the Bloods in 2007 and was present at Slack's house at the time of the shooting. Oliver testified that, earlier in that day, Davis had given him a .380 High Point handgun to hold. That evening, Davis called Oliver on several occasions while Oliver was visiting Slack's residence to learn the logistics of who was in the apartment and where each person was located. Davis also told Oliver to open the back door to allow him access to the apartment. Oliver further testified that, when Davis and three other individuals showed up at Slack's house later that night, Oliver opened the back door to the apartment for Davis and the three men standing behind Davis. Oliver identified two of the men with Davis as "G-Red" (Demar Edwards) and "Monster" (Lewis Gray) and stated he could only see the shadow of the fourth man on the porch. Oliver did not know the [identity] of the fourth man. Oliver recognized Davis and Edwards as fellow Blood gang members. He also testified that Gray was not a Blood. While on the back steps, Davis then asked Oliver to return possession of his .380 High Point. Oliver testified that, after giving Davis the .380 High Point handgun, Oliver went into the second floor bedroom with Slack and closed the door. After a few minutes, Oliver heard gunshots. After hearing the shots, Oliver opened the door and saw three men run down the stairs and past the door. Oliver could not identify the three individuals who ran down the steps. Oliver

claimed that he did not know the mission of the four men who came into Slack's apartment until after the shooting. Later, in the early morning hours, after Davis returned to Easton, Oliver reunited with Davis. Oliver claimed that Davis told him that the fourth man was known as "T-Bone." Oliver knew that [Hollist] went by the street name "T-Bone."

Slack and Bricker testified that they were both in the house at the time of the shooting. However, neither saw who shot Rene, Hamlin, and Armour. Slack saw three men run past the door of her bedroom located on the second floor but could not identify the men. Bricker, who was in a separate bedroom on the third floor of Slack's house, saw three men run down the third floor stairs to the second floor of the house but also could not identify the men.

Thompson, another "purported" former Blood gang member, was a Blood in 2007. Thompson testified that Davis, Oliver, Edwards and [Hollist] were also Bloods. Thompson testified that he was with Edwards, [Hollist], Davis, and Gray at a bar during the evening of November 28, 2007, before Davis'[s] vehicle left Newark. Thompson testified that he saw the four men get into Davis'[s] car and drive away, however, Thompson denied knowing the destination or reason for their trip. Thompson also spoke with [Hollist] the day after the shootings. [Hollist] reportedly told Thompson he participated in the homicides and that he was a shooter. Thompson also spoke with Edwards after the shootings. Edwards told Thompson that, although Rene was the target, they also killed Hamlin and Armour so there would not be witnesses.

Gray denied that he was a Blood gang member. Gray testified that he met Thompson at a bar in Newark on November 28, 2007. Gray testified that he had an independent business relationship with Thompson related to drug distribution. Apparently, Thompson was his supplier. Gray testified that he drove to Easton with Edwards, [Hollist], and Davis that evening. Gray asserted that he was not friendly with Edwards, Davis, or [Hollist], but was asked to go along with them by Thompson. Gray denied knowing that there was a plan to shoot the victims. Gray assumed he was sent as an observer for an unknown mission that was related to Thompson. Gray testified that, when Davis led the group to the scene of the shooting, Oliver opened the backdoor to the apartment and handed Davis a .380 High

- 5 -

Point handgun. Davis than gave the .380 High Point to [Hollist]. According to Gray, he brought his own sawed-off shotgun that was inoperable and Edwards brought a 9 millimeter handgun. Once in the house, Edwards, [Hollist], and Gray went to the third floor to the room which contained the victims. According to Gray, Davis did not go up to the third floor. Gray testified that he watched Edwards and [Hollist] shoot Rene, Hamlin, and Armour. After which, the three men ran downstairs and out of the house. Gray initially did not cooperate with the police. However, he eventually identified Davis but still withheld the identification of Edwards and [Hollist] because he believed they had given a justifiable excuse for the shootings. Eventually, Gray identified Edwards and [Hollist] because he later found out their excuse was not true. Gray testified that, in return for his cooperation, Gray was permitted to plead to Third-Degree Murder and received a bargain of 13-26 years [in prison].

The relevant portion of Spring's testimony stated that Spring was at Slack's house in the second floor bathroom at the time of the shootings. Spring heard the shots and shortly after, Davis kicked in the bathroom door while holding a handgun. Spring heard the commotion while in the shower and he managed to crawl out through the bathroom window and flee to a nearby bar. The only individuals Spring saw were Gray and Davis.

[Hollist] testified in his own defense. [Hollist] denied that he was a member of the Blood gang. [Hollist] admitted to being in Davis'[s] car with Davis, Gray and a third individual on the drive to Easton.[1] [Hollist] testified that he and Gray sat in the back seat and that Gray had a shotgun which he placed on his lap. [Hollist] told the [trial court] that he instructed Gray to point his shotgun another direction as it was laying on Gray's lap and pointed in the direction of [Hollist]. [Hollist] stated that once they arrived at Slack's home, Davis, Gray and the third man left to do their business but he waited in the car because he felt sick and eventually threw up outside the car.[2] [Hollist] also testified that Davis, Gray and the third man did not tell him what happened in Slack's house and he did not know about the shootings until the police began investigating him. [Hollist] claimed that he believed the others were possibly involved in a drug transaction or plan to rob drug dealers and Thompson wanted [Hollist] to be present to make sure that Thompson was not ripped off by the others. [Hollist] testified that could not identify the third man in the Davis car.

- 6 -

¹ [Hollist] said he was with three others but only identified Gray and Davis at trial. In other statements to the police, he said the fourth person was Edwards. [Hollist] also lived with Edwards in 2008 and was good friends with him.

² Although [Hollist] stated the he threw up in the street while he was waiting, no vomit or trace thereof was found by the investigating police after a thorough search of the area conducted during the processing of the crime scene.

Edwards did not testify; however, he asserted in his closing argument … that the evidence did not establish that he was at the crime scene.

Prior to the commencement of closing arguments, Counsel for [Hollist] and Edwards argued that the Commonwealth should be precluded from arguing that Edwards and [Hollist] were both shooters, because the direct evidence established that only two guns were used to commit the crimes and, therefore, the only logical conclusion would be that there were, at most, only two shooters. Therefore, to argue in the separate trials that Davis, Edwards, and [Hollist] were all guilty of First Degree Murder for being actual shooters involved in the use of factually contradictory theories in different trials … would be "fundamentally unfair" and a violation of due process. [The trial court] denied this motion.

Edwards and [Hollist] were each convicted of three counts of [first-degree murder] and three counts of [conspiracy to commit first-degree murder.] Both Edwards and [Hollist] were sentenced to three consecutive life sentences without the possibility of parole.

…

**Commonwealth v. Hollist**, No. 1414 EDA 2012, at 1-7 (Pa. Super., filed 11/22/2013) (unpublished memorandum) (brackets in original and brackets added) (quoting Trial Court Opinion, 4/9/2012, at 1-9).

The trial court denied Hollist's post-trial motions, and this Court affirmed his judgment of sentence. Hollist filed a timely PCRA petition, which he later amended. At the PCRA hearing, Hollist, his mother, and lead trial counsel all testified. The PCRA court subsequently denied Hollist relief on his PCRA petition, and this timely appeal followed.

On appeal, Hollist raises four issues. Issues one, two, and four are based upon allegations of trial counsel ineffectiveness. We will address these issues first before turning to Hollist's final issue, which is based upon an allegation of trial court error.

"On appeal from the denial of PCRA relief, our standard and scope of review is limited to determining whether the PCRA court's findings are supported by the record and without legal error." **Commonwealth v. Edmiston**, 65 A.3d 339, 345 (Pa. 2013) (citation omitted). "[Our] scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the PCRA court level." **Commonwealth v. Koehler**, 36 A.3d 121, 131 (Pa. 2012) (citation omitted).

"[T]his Court applies a *de novo* standard of review to the PCRA court's legal conclusions." **Commonwealth v. Spotz**, 18 A.3d 244, 259 (Pa. 2011) (citation omitted). In order to be eligible for PCRA relief, a petitioner must plead and prove by a preponderance of the evidence that his conviction or

sentence arose from one or more of the errors listed at 42 Pa.C.S.A. § 9543(a)(2).

It is well settled that

[t]o plead and prove ineffective assistance of counsel a petitioner must establish: (1) that the underlying issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice resulted from counsel's act or failure to act.

*Commonwealth v. Rykard*, 55 A.3d 1177, 1189-1190 (Pa. Super. 2012) (citation omitted). "Arguable merit exists when the factual statements are accurate and could establish cause for relief. Whether the facts rise to the level of arguable merit is a legal determination." *Commonwealth v. Barnett*, 121 A.3d 534, 540 (Pa. Super. 2015) (citation omitted). "Generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests." *Commonwealth v. Colavita*, 993 A.2d 874, 887 (Pa. 2010) (citation omitted). A failure to satisfy any prong of the test will require rejection of the claim. *See Commonwealth v. Spotz*, 84 A.3d 294, 311 (Pa. 2014).

Hollist first argues that the PCRA court erred in not finding trial counsel's investigation and preparation for trial ineffective. Hollist specifically takes aim at trial counsel's failure to hire a private investigator early in the pre-trial process. He first contends that had trial counsel effectively utilized the services of a private investigator, he could have attacked the credibility

of his alleged co-conspirators, who identified Hollist as one of the shooters. Hollist also argues that when trial counsel did employ a private investigator, in an attempt to locate a possible eyewitness, it was too little, too late.

Regarding his decision not to employ a private investigator from the start of his pre-trial process, Charles Banta, Esquire, provided the following testimony:

> Q. Did he ever ask you to get a private investigator, interview witnesses?
>
> A. I don't believe so. In fact, from day one, our position was, and Mr. Hollist made this clear, that he was in the car, that he told me about the things that led up to the trip to Easton, the fact that he was – he thought it was a drug deal, and he came along to keep an eye on the money for I think somebody referred to as Big Ro from Newark, but that he had gotten sick in the car, and he stayed in the car when the others went into, quote, make the drug deal.
>
> Q. Now, as such, did you find the need, at anytime, to go out and interview witnesses and look for additional witnesses or anything of that nature?
>
> A. Well, we had a big advantage in the – over most cases I did, because we kind of had a preview of it in the form of trial transcripts of the Ali Davis trial.
>
> Q. And did you have an opportunity to review those transcripts?
>
> A. In very, very great detail, yes.
>
> Q. So then it's safe to say that you didn't feel the need, at any point, other than for the purpose you wished him to have a private investigator, to do any investigation?
>
> A. The only need we felt to hire a private investigator we were close to the trial. We wanted to use Lakindal Spring's testimony. I had an address and phone number for him out in, I

think North Las Vegas, Nevada. I called this number and I believe the number was disconnected. At this point we felt it was necessary to show that he was not available. We really didn't want him as a witness. We had his testimony from the Davis Trial, and I would prefer to use that, because I knew exactly what was said. I didn't have to wait for him to get on the stand and embarrass us with something that we were not expecting, because I know about what he had said. So we needed to show that he was unavailable. Se we hire a private investigator to try to track him down. We could not find him and we used that as a basis for establishing the unavailability of the witness so that we could use his prior sworn testimony.

…

Q.     And part of this testimony was that he didn't see Mr. Hollist when that door swung open?

A.     That's correct. When the door swung open, he saw Ali Davis, Demar Edwards, and I think Lewis Gray.

N.T., PCRA Hearing, 5/7/15, at 61-63.

This testimony reveals that Attorney Banta had a reasonable trial strategy. His client admitted that he had travelled in Davis's car from Newark to Easton on the night of the homicides. Hollist further admitted that he saw his alleged co-conspirators with guns. Hollist asserted, however, that he had not left the car with the others, and instead remained unaware of the murders. Thus, the only factual issues at trial were whether Hollist was aware of his associates' intent to commit murder, and whether he was aware of their actions in the building.

In addition, Attorney Banta had access to the prior sworn testimony of eyewitnesses and investigating officers. This testimony included an

eyewitness who testified that Hollist was not with the other three conspirators when they entered the building.

The trial judge who heard the case against Hollist had presided over the prior jury trial of Davis regarding these murders. He had been present to observe these witnesses testify and observe their credibility. He was well aware of the motives for fabrication each of the alleged conspirators had, and could weigh their testimony accordingly.

Under these circumstances, it was reasonable for Attorney Banta to determine that an investigator was unnecessary for a trial strategy focusing on Hollist's story that he was unaware of the murder plot and that he did not accompany the others into the building. He had immutable prior testimony of an eyewitness who did not place Hollist in the building, and extensive material for attacking the credibility of those witnesses who did place Hollist in the building. It was reasonable to favor a strategy that limited the opportunity for surprise testimony and highlighted the prior sworn testimony. We therefore conclude that Hollist failed to establish that Attorney Banta did not have a reasonable trial strategy girding his decision not to employ a private investigator early in the pre-trial process.

In the alternative, Hollist contends that Attorney Banta was ineffective in failing to locate Spring and have him testify at Hollist's trial. However, as noted above, it was reasonable for Attorney Banta to favor Spring's recorded favorable testimony from Davis's trial over new and possibly surprising

testimony from Spring. Furthermore, as noted, the trial judge had observed Spring's prior testimony first hand and was well equipped to weigh it. We therefore conclude that Hollist is entitled to no relief on this claim.

In his next claim, Hollist argues that Attorney Banta was ineffective in allowing him to waive his right to a jury trial. Initially, we note that Hollist's argument on this issue is not clearly an assertion of trial counsel ineffectiveness. Hollist testified at the PCRA hearing that trial counsel had never given his opinion on whether Hollist should waive his right to a jury trial. **See** N.T., PCRA hearing, 5/7/15, at 21. "He – Mr. Banta, Ms. Kollet always told me it was my decision and I had to make the decision." **Id**.

Rather, Hollist's argument centers on the advice allegedly given by the mitigation expert hired by trial counsel. **See id**.; **see also** Appellant's Brief, at 18. At the PCRA hearing, Hollist asserted that the mitigation expert had advised him that the trial judge had told the mitigation expert that he was inclined to find Hollist not guilty. **See** N.T., PCRA hearing, 5/7/15, at 13-14. However, he did not claim that Attorney Banta was ever made aware of the mitigation expert's alleged claims.

Under these circumstances, it is difficult to frame Hollist's issue as one of trial counsel ineffectiveness. Hollist concedes that Attorney Banta, and his co-counsel Attorney Kollet, always informed him that the ultimate decision was his. Furthermore, he does not assert that either counsel gave bad

advice. Finally, he does not assert that he ever discussed his meetings with the mitigation expert with trial counsel.

Hollist does not provide an explicit explanation of what he believes trial counsel should have done, other than to state that it was wrong to waive a jury a trial in light of the fact that a previous jury did not impose the death penalty on Davis. However, Hollist acknowledges that "there is always the possibility that a jury could find the aggravating circumstances outweigh the mitigating circumstances in this matter." Appellant's Brief, at 18.

In any event, even if we consider Hollist's claim as a claim of trial counsel ineffectiveness, we conclude that Attorney Banta had a reasonable strategy in not opposing a bench trial. Attorney Banta testified that he felt that a bench trial was advantageous because the trial judge had heard the testimony from the Davis trial, and was aware of the weaknesses in the Commonwealth's case. *See* N.T., PCRA Hearing, 5/7/15, at 66. Furthermore, Attorney Banta explained that "as a capital defense lawyer, my primary concern is getting the death penalty off the table." *Id*. As even Hollist concedes, there is always a risk that a jury will impose the death penalty. Thus, Attorney Banta pursued a reasonable strategy to further his client's interests in not advising against a bench trial where the death penalty was no longer a possibility. Hollist's second numbered claim on appeal merits no relief.

In his fourth numbered claim, Hollist argues that trial counsel was ineffective in failing to move for the recusal of the trial judge, since the trial judge had heard the testimony from the Davis trial. However, as noted above, Attorney Banta believed that this was an advantage for Hollist, as it highlighted the weaknesses in the case against Hollist. Furthermore, it is unclear whether a motion to recuse would have been successful in any event. It was a reasonable strategy to utilize the trial judge's familiarity with the case against Davis as a foil to demonstrate the weaknesses in the Commonwealth's case against Hollist. We therefore conclude that Hollist's fourth numbered claim merits no relief on appeal.

Finally, Hollist claims that the trial court's oral colloquy to determine whether his decision to waive his right to a jury trial was knowing and voluntary was defective. However, this claim does not satisfy the requirements of the PCRA, in that Hollist had the opportunity to raise this issue on direct appeal, but failed to do so. **See** 42 Pa.C.S.A. § 9543(a); **Commonwealth v. Roney**, 79 A.3d 595, 617 (Pa. 2013). This claim is waived. Hollist's final claim therefore merits no relief.

Since none of Hollist's claims are meritorious, we affirm the PCRA court's order.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/6/2017