JUSTICE DOUGHERTY, DISSENTING
As the majority acknowledges, we granted allowance of appeal in this case, in part, to determine whether "common law [conspiratorial] liability exists in our statutorily codified system of substantive criminal law." Majority Opinion, at 409. Yet, the majority does not reach that issue, because it concludes the evidence was insufficient to prove a conspiracy existed in the first *417 place. From my independent review of the entire record, I conclude there was ample evidence - including all reasonable inferences therefrom, viewed in the light most favorable to the Commonwealth - to prove a criminal conspiracy existed. Thus, I respectfully dissent.
At the outset, I agree with certain aspects of the majority opinion: it properly sets forth the applicable standard of review, id. at 409, the elements of the substantive offense of criminal conspiracy, id. at 409, and the means by which those elements may be proven beyond a reasonable doubt, id. at 410-11. I also agree with the majority's observation that "[f]ights involving multiple participants, particularly those in which a person interjects herself into a brawl after it has commenced, present unique challenges for determining whether a conspiracy existed." Id. at 411. In my respectful view, where the majority goes astray, and where I therefore depart from its holding, is in its selective use of the facts - and in the defense-friendly inferences it draws from those facts - to support its ultimate conclusion "[t]he record contains no evidence that the actions undertaken by the women who exited the Jeep were pursuant to any form of agreement, spoken or otherwise, between them and [appellant]." Id. at 412. In my view, there was more than enough evidence, spoken and otherwise, to prove appellant and the others entered into a criminal conspiracy to assault the victim.
By all accounts, appellant was the initial aggressor, and his companions the impetus of the confrontation. Indeed, it was precisely because appellant's companions - which included appellant's girlfriend, to whom he was speaking through the driver's side window - refused to move their Jeep that the victim was forced to drive over the curb in order to park. Notes of Testimony (N.T.) 3/23/15 at 12. When the victim exited his car and asked appellant why his group refused to let him pass, appellant cursed at him. Id. at 17. The victim approached and the two men began to argue before appellant came at the victim with his arms raised and hit him in the face. Id. at 18. The victim swung back to defend himself, at which point the pair began to tussle in the street. Id. at 18, 34. While they were fighting, appellant's companions exited their vehicle and one of them "came up behind [the victim] and pulled [his] glasses off" before spraying him in the eyes with mace, blinding him. Id. at 18-19. Someone then pushed the victim to the ground. Id. at 19, 22. The victim "couldn't get up" because appellant had climbed on top of his back, and someone else "had their foot on [his] hand." Id. at 20. While they kept him pinned on the pavement, stomach-down, one of the women from the Jeep "kept spraying and kept spraying and kept spraying" him in the face with the mace, further incapacitating him. Id. at 22-24. Simultaneously, multiple members of the group, including appellant, kept "stomping" and "kicking" him. Id. at 43-44, 49. It was not until police arrived that the group dispersed; the sole exception was appellant, who, by that point, had the victim on his back and was "kneeling on his chest and punching him in the face." Id. at 58.
From this evidence, the majority draws two principal conclusions. First, "[t]he trial testimony does not suggest that [the victim]'s assailants formed a criminal agreement during the brief period between the time when [the victim] parked his car and the moment when the fight began." Majority Opinion, at 412. Second, the testimony, even inferentially, does not support a conclusion that a conspiracy transpired "once the Jeep's occupants joined the fight." Id. It is this latter conclusion with which I disagree.
*418 According to the majority, "unlike a scenario in which one person restrains the victim while another assaults him, forming what likely is a criminal conspiracy, there is no evidence that [appellant] held [the victim] down so that others could join in his assault." Id. at 412. Setting aside the fact this conclusion improperly makes a favorable inference in appellant's favor, see Commonwealth v. Derr , 501 Pa. 446, 462 A.2d 208, 210 (1983) ("[i]n evaluating the quantum of evidence, all reasonable inferences must inure to the benefit of the verdict winner"), the evidence, taken as a whole and in the light most favorable to the Commonwealth, supports the opposite conclusion. Notably, the majority fails to address salient evidence of communications between appellant and his companions which, when combined with other evidence showing the relation, conduct, and circumstances of the parties, proves beyond a reasonable doubt appellant and that group had a unity of criminal purpose.
In addition to the evidence that appellant's group was within earshot when appellant cursed at and then began to fight with the victim - indicating they were intimately aware of the root of the confrontation as well as appellant's intent - there was evidence appellant and the others communicated once the scuffle began. Jeffrey Jones testified that, after appellant and the victim (whom he described as a "huge gentleman") began fighting in the street, he heard appellant yell, "Yo, he's got a knife." N.T. 3/23/15 at 77. Jones explained:
By the time I got outside, [appellant's] girlfriend, whoever was with [her], they were both out of the car at this point. And everybody was in the middle of the street. I heard [appellant] yelling, Yo, he's got a knife. He's got a knife. At this time the females are pepper-spraying the gentleman and [appellant] is telling me to look for the knife. Find the knife. So I'm looking around trying to find the knife. Before I knew it, the police had pulled up. That's pretty much what happened.
...
I never seen the knife. I did attempt to look for it because [appellant] told me the guy has a knife. He has a knife. Find the knife. And then his girlfriend and whoever, she was - they seen - they had spray. Trying to pepper-spray this guy and everything because he's a pretty big guy. So they are trying to pepper-spray him and [appellant] is hollering at me, [f]ind the knife. He's got a knife.
Id. at 76-77.[1] While reasonable minds might disagree whether this testimony implies the women began spraying the mace before, after, or at the same time appellant alerted the group that the victim possessed a knife, the point is that appellant "kept hollering ... about a knife," id. at 78, the reasonable inference from which is that he sought - and ultimately received - assistance in subduing and further attacking the allegedly armed victim. This eminently reasonable inference is directly contrary to the majority's assertion that "[t]here is no evidence that [appellant] invited their participation," Majority Opinion, at 412, or at least that he encouraged their continued involvement. See Commonwealth v. Neff , 407 Pa. 1, 179 A.2d 630, 632 (1962) ("It has been consistently and repeatedly held that the acts of the parties may show that there was a concerted action pursuant to a common *419 design to accomplish a common purpose.") (citation omitted).
Furthermore, appellant's warning about the knife was not the only communication between appellant and the so-called "spontaneous" intervenors evincing an agreement and a shared criminal intent. The victim also testified that, as appellant held him down and while the other attackers were "hollering," "threatening," and "hitting" him, one of them specifically stated to the rest, "Get him off of me." N.T. 3/23/15 at 19, 23. Again, this testimony is contrary to the majority's conclusion there was no evidence showing appellant and his cohort "desired to work in tandem[.]" Majority Opinion, at 412. In fact, it proves they kept in constant contact during their coordinated attack, and even solicited one another's help when the "huge" victim proved too much to handle alone.
The same is true of the evidence, barely acknowledged by the majority, that when Officer Henry Schoch arrived on the scene, the women began screaming at the appellant to "get off of" the victim. N.T. 3/23/15 at 62. The majority casts this evidence as supporting its position that the appellant intended only to "continue his own assault" of the victim. Majority Opinion, at 413. In my view, this evidence simply reinforces the close relationship between appellant and the rest of the group and serves as additional proof of the shared criminal agreement between them. Indeed, the reasonable inference from this statement is that the women were attempting to prevent their co-conspirator's arrest by law enforcement, which may have ultimately implicated them in the assault as well. This statement therefore not only supported the inference that a conspiracy existed, but also indicated consciousness of guilt. See Commonwealth v. Madison , 501 Pa. 485, 462 A.2d 228, 231 (1983) ("consciousness of guilt may reasonably be inferred from the fact than an accused is attempting to elude the police").
In sum, I believe the majority fails to give effect to the full trial record, and draws improper inferences in favor of appellant, rather than the Commonwealth as verdict-winner, as the law requires. Viewed properly, the evidence demonstrated appellant was in constant communication with his cohort - including his girlfriend - before, during, and after their concerted attack on the victim. As the majority correctly recites, "a conspiracy may be proven inferentially by showing the relation, conduct, or circumstances of the parties, and the overt acts of alleged co-conspirators are competent as proof that a criminal confederation has in fact been formed." Majority Opinion, at 410, citing Commonwealth v. Kennedy , 499 Pa. 389, 453 A.2d 927, 930 (1982). I find the evidence here, viewed in the light most favorable to the Commonwealth, proved such a criminal confederation between appellant and his companions.
In a similar vein, I respectfully disagree with the majority's conclusion the evidence was insufficient to sustain appellant's convictions for aggravated assault and possession of an instrument of crime under a theory of accomplice liability. Preliminarily, I distance myself from the majority's seeming rebuke of the Superior Court for addressing accomplice liability where that theory of liability "played no role in the Commonwealth's theory of the case, the closing arguments, the trial court's deliberation, or the actual verdicts[.]" Majority Opinion, at 415. As a legal matter, on sufficiency review, a reviewing court concerns itself with what the fact-finder could have decided - including guilt as an accomplice - based on the evidence presented. See Commonwealth v. Brown , 617 Pa. 107, 52 A.3d 1139, 1164 (2012) (question on sufficiency review is "whether any *420 'rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' "), quoting Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis added). See generally Commonwealth v. Marks , 442 Pa. 208, 275 A.2d 81, 82-83 (1971) ("On appeal, it is the judgment or order itself which is the subject of review, not the reasons given by the court below in support of its action."). Accordingly, the Superior Court's potential misinterpretation of the trial court's rationale notwithstanding, I see no basis for chastising the intermediate appellate court for its fidelity to conducting a proper sufficiency analysis.[2]
Turning to the merits, I note Section 306 of the Crimes Code provides that a person is liable as an accomplice if he: (1) intended to promote or facilitate the commission of a crime; and (2) aided, agreed, or attempted to aid the principal in committing that offense. 18 Pa.C.S. § 306(c)(1). I conclude the evidence met these requirements. Contrary to the majority's conclusion appellant "did nothing" to assist the mace-spraying woman, Majority Opinion, at 415, the evidence and reasonable inferences therefrom demonstrated he solicited her help and then engaged in a joint assault against the victim, including jumping on the victim's back and holding him down while the woman repeatedly sprayed him with mace. Keeping in mind "[t]he least degree of concert or collusion is sufficient" to impose responsibility as an accomplice, Commonwealth v. Coccioletti , 493 Pa. 103, 425 A.2d 387, 390 (1981), I conclude this evidence, viewed in the light most favorable to the Commonwealth, was sufficient to prove appellant's guilt under a theory of accomplice liability.
The only issue remaining, then, is the one the majority does not reach: "whether criminal convictions can rest upon the theory of conspiratorial liability, when such theory is not provided for expressly in our Crimes Code." Majority Opinion, at 409. Like the majority, I also would not reach the merits of this important question - but for a different reason. In his Pa.R.A.P. 1925(b) statement of matters complained of on appeal, appellant challenged the sufficiency of the evidence to prove him guilty either as a conspirator or an accomplice, but he did not allege that the concept of conspiratorial liability itself no longer exists under Pennsylvania law. Indeed, the record shows appellant first raised this claim in his reply brief before the Superior Court. See Appellant's Reply Brief to the Superior Court, at 4-11. It is therefore waived. See Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."); Commonwealth v. Colavita , 606 Pa. 1, 993 A.2d 874, 893 (2010) ("a reply brief is not an appropriate vehicle to raise a new claim").[3]
For all these reasons, I respectfully dissent.
Justice Mundy joins in this opinion.

In a statement to police, the victim asserted he produced the knife, but appellant took it from him and used it to cut his face. The officers did not find a knife at the crime scene, and the victim denied any allegations related to the knife at trial. N.T. 3/23/15 at 35-38, 60.

I also note the trial court's opinion is, at times, less than clear with regard to the relevant theories of liability. Compare Trial Ct. Op. at 18 (referring to the women as "accomplices") with id. at 20 (referring to them as "co-conspirators").

Recognizing that error review is not typically this Court's function, and because the only issue properly implicating our discretionary review authority was not preserved for appeal, I would dismiss this case as having been improvidently granted.